Sven ERIKSSON and Teleric,
S.A., Plaintiffs,

v.

William GALVIN, Pierre Schoenheimer,
Recognition Devices, Inc., Radix Organi-
zation, Inc. and Patricia LeLandais, Ex-
ecutrix for the Estate of Pierre J. Le-
Landais, Defendants.

No. 74 Civ. 4031 (CHT).

United States District Court,
S. D. New York.

Jan. 28, 1980.

Mousaw, Vigdor, Reeves, Heilbronner & Kroll, Rochester, N. Y., for plaintiffs; Robert J. Pearl, Rochester, N. Y., of counsel.

Patrick J. Carr, New York City, for defendant Galvin.

Michael C. Devine, New York City, for defendants LeLandais, Schoenheimer and Radix.

## OPINION

TENNEY, District Judge.

This is an action tried to the Court for alleged violations of sections 12(1), 12(2) and 17(a)(2) of the Securities Act of 1933

("Securities Act"), 15 U.S.C. §§ 77l(1), 77l(2) and 77q(a)(2), section 10(b) of the Securities Exchange Act of 1934 ("Securities Exchange Act"), 15 U.S.C. § 78j(b), New York General Business Law § 352–c, and other violations of state law. Such violations are alleged to have occurred on the sale by defendant Recognition Devices of certain of its common stock valued at $10,000 plus its $40,000 promissory note to plaintiff Sven Eriksson on September 13, 1973. However, it is necessary that we consider events occurring well prior to September 1973 in determining just what Eriksson's purpose, intent and knowledge were in making this "investment" in Recognition Devices.

Eriksson is a Swedish electronics engineer now living in Switzerland, who in 1956 started a company, Telekontroll, to manufacture and sell electronic "paging" equipment. In the summer of 1972 Eriksson learned of an inventor, Robert Lester in the United States who had invented "paging" or "localizing" equipment that used only ultrasonic, rather than electronic, transmissions. Lester referred to his system as Trakatron and had assigned it to his company, then named Recognition Devices—a company distinct from the defendant in this action. Eriksson had a friend in the United States, Sten Persson who was also an engineer, and it was Persson who brought Lester to Eriksson's attention. Thereafter, in the summer of 1972 Eriksson called Lester and had discussions with him since Eriksson was interested in using Trakatron in connection with his electronic paging system. Indeed, in early October 1972 Lester conferred with Eriksson at the offices of Telekontroll in Sweden with a view to developing a patent licensing agreement between Telekontroll and Recognition Devices whereby Telekontroll would manufacture the Trakatron systems for the European market with further provision for Telekontroll to manufacture in all other parts of the world. Telekontroll was also given a temporary right to build a prototype of Lester's ultrasonic locating system and in late 1972 or early 1973 did just that. Letter from Eriksson to Lester, dated December 12, 1972, Defendants' Exh. B.

Before any action was taken to formalize such an agreement, Lester and Recognition Devices had transferred the Trakatron and other patents together with the right to use the name "Recognition Devices" to a new company bearing the name RCDS Enterprises, Inc. ("RCDS"). This transfer arose out of the following circumstances. One of the investors in Lester's Recognition Devices was an individual named Sanford Bronstein, who was the president of Cedars of Lebanon Hospital in Miami, Florida. As a hospital president, Bronstein had come into contact with defendant William Galvin, who was in the hospital consulting field. Bronstein told Galvin about Recognition Devices and, at Bronstein's request, Galvin went to see Lester in the fall of 1972 after Lester's conference with Eriksson in Sweden. Galvin himself was looking for a project to invest in, and reported back to Bronstein that all that was needed was money, management and sales, but that in the company's present state it would be advisable to form a new company. Bronstein indicated he would support such a project by way of a contract to install the Trakatron system at Cedars of Lebanon Hospital. Galvin, not being a money-raiser, contacted defendant Pierre LeLandais, whom he had previously known and through whom he met defendant Pierre Schoenheimer, for the purpose of forming the new company and of raising additional money. LeLandais and Schoenheimer were the original managing directors of Radix Organization Inc. ("Radix"), which was in the business of originating, structuring and implementing corporate development programs.

Galvin, LeLandais and Schoenheimer met with Lester in January 1973. They explained that they had formed or were in the process of forming a new company, RCDS, which would purchase Recognition Devices' name, patents, and sales leads, and would hire Lester for one year. Lester, enthusiastic about the proposal, obtained approval of his board of directors, and on April 2, 1973 the transfer of assets to RCDS was effected. The consideration for the transfer was

(a) 1500 shares of RCDS (*i. e.*, 15% of the number of shares originally issued) and (b) cash payments not to exceed $200 million, of which $5000 was paid at the time of transfer plus: 10% of cumulative sales above $50,000 but under $1 million; 5% of next $1 million of sales; and 3% on sales over $2 million but not to exceed 30% when added to cost of sales. In addition, RCDS retained the name Recognition Devices, Inc., the services of Intersonics Corporation ("Intersonics," the new name of the old Recognition Devices, Inc.), and, more particularly, the services of Lester for a period of not less than 12 months for a fee of $2000 per month or 5% of sales, whichever was higher. Finally, the assets acquired by RCDS were to revert to Intersonics if Intersonics had not received at least $100,000 by the third anniversary date of the agreement. The patents transferred consisted of the Trakatron patent, two other issued patents, and four pending patents. The certificate of incorporation of RCDS Enterprises was amended on April 2, 1973 (the day of the purchase of the assets of the Lester company), and a certificate was filed on April 17, 1973; thereafter the company became known as Recognition Devices, Inc. ("RD").

At the time of the purchase of the Lester patents and for some months thereafter, those connected with RCDS and thereafter with RD appear to have been in error as to the capitalization of RCDS and, consequently, of RD. The original funding of RCDS of $25,000 was subscribed to by Galvin, Mrs. Galvin, Radix (*i. e.*, LeLandais and Schoenheimer), and by Robert Feldstein and two other principals of Scientific Prototype Corporation ("Prototype") which, under Feldstein, was to prepare a prototype of the Trakatron system. Actually the Galvins and Radix went in on a 50/50 basis, but Radix allocated 426 of its 4250 shares to Prototype and the Galvins subscribed to 4250 shares equally. At $1 per share this accounted for $8500 of the initial funding. The balance was covered by $16,500 of 8% three year Subordinated Notes. With the transfer of 1500 shares to Intersonics, the total shares outstanding were 10,000, out of a total of 15,000 shares that it was mistakenly believed constituted the capital structure of the company. Actually, the certificate of incorporation authorized only the issuance of 200 shares of common stock. The defendants rectified this oversight as soon as it was discovered by amending the certificate.

There was no further solicitation of funds at the time of the initial $25,000 investment. It was contemplated, however, that at an appropriate time the company would attempt to raise an additional $250,000 from a group of sophisticated investors known to Radix. Indeed, one potential investor was on the scene prior to July 1973, but the deal fell through. The defendants hoped that the product could be developed and that the engineers at Prototype would construct a model that would, in turn, attract investors.

On May 1, 1973 the contract with Cedars of Lebanon Hospital and RD was signed. Exh. A to Plaintiffs' Exh. 2. It called for the sale and the installation of a Trakatron 300 (Locating) System, a purely ultrasonic system. Two phases were prescribed: Phase I, which involved a survey by RD of the hospital buildings, ultrasonic propagation studies, wiring diagrams, field testing and general planning as to equipment, was not to cost more than $50,000 and was to be completed by September 1, 1973; Phase II called for delivery by RD of the hardware and was to be completed by March 1, 1974. The estimated cost for Phase II was set at $187,500 or a total cost for both phases not to exceed $237,500.

In the spring of 1973 after the contract with Cedars of Lebanon had been signed, work was commenced on the preparation of a brochure to crystallize how RD was going to function in the market areas it was eventually going to enter. Both LeLandais and Galvin worked on this material, which was prepared in the office of Radix where RD was situated. The document was completed on the letterhead of RD late in June or early July 1973 and was entitled "History Current Operations & Business Plan For The Future." It was dated July 19, 1973

and marked "confidential." Plaintiffs' Exh. 2. It is referred to hereinafter as the "Report." Fifteen copies of this document were prepared. The Report consisted of (1) an introduction; (2) a general description of The Trakatron System and its applications including a more detailed description of Trakatron's first application to be installed at Cedars of Lebanon Hospital; (3) a description of the business acquired, i. e., the assets acquired from Intersonics and the contract for the services of Intersonics; (4) the business plan, including engineering and product development, marketing and sales, and finances; (5) budgeted operating expenses for the fiscal year 1973 showing total expenses of $115,150; (6) a description of management, including biographical data on Galvin, LeLandais, Schoenheimer, Feldstein, and Martin; (7) capitalization, listing the issuance of 10,000 shares to Mr. and Mrs. Galvin, Radix, Intersonics and certain personnel of Prototype; (8) balance sheet as of July 15, 1973 (unaudited and on a cash basis); and (9) profit and loss statements as of July 15, 1973, one of which reflected no revenues and expenses of almost $31,000, the other incorporating the revenue to be received from Cedars of Lebanon Hospital on the contract, showing net revenue from that source of $100,000 and total net income of $69,159.90. Attached and made part of the Report as exhibits were: A) the contract with Cedars of Lebanon Hospital Corporation, Miami, Florida; B) the patents granted to date; C) new products, represented by reprints of magazine and advertising literature relating to Trakatron; D) a list of countries where Trakatron might be introduced; E) Radix: an overview, including its services to business enterprises, its services to private and institutional investors, its investments, examples of Radix at work, and its organization, including biographical data on LeLandais, Schoenheimer, and a Daniel Presser, identified as a director and consultant; and F) a description of the activities and principal officers of Prototype.

Nowhere in the Report is any mention made of any proposed sale of the stock of RD. According to LeLandais, the purpose of the Report was to crystallize how RD was going to function in the market area. However, it was recognized that the Report might be useful in future financing, although LeLandais did not consider it to be a "prospectus."

Galvin had first heard of Eriksson in March 1973 from correspondence between Lester and Persson relating to a grant by Lester to Eriksson of a license in Europe in 1972. Galvin called Persson and was reassured that although a license agreement had been forwarded by Lester to Eriksson following Eriksson's letter of October 12, 1973, Defendants' Exh. B, nothing had come of it. Indeed, nothing concrete appears to have occurred with respect to Eriksson and the defendants until July 2, 1973 when Persson and Lester wrote a joint letter to Eriksson on the letterhead of Elenex, Inc., Persson's employer, to bring Eriksson up to date on Recognition Devices, Defendants' Exh. G. In this letter Persson advised Eriksson, in part, as follows:

Bob [Lester] recently sold Recognition Devices, the patents and trade marks to Radix, 375 Park Avenue, New York City, for which Bob received royalties and 15 percent of their stock. Radix is a miniconglomerate with an annual business of between $15–$20 million a year.

Radix presently desires to purchase from you, Sven, if ready at this time, a RF/Ultrasonic locating system·for demonstration purposes in that they feel they have potential customers·lined up for you in this area.

I will let Bob take over this letter from here.

*Id.* Lester then continued the letter as follows:

I hope you answer this letter, Sven, because I am beginning to wonder.

I have enclosed a letter from the new Recognition Devices, for which I am now acting as a consulting engineer. I have told them that Mr. Sten Persson is their representative and we can negotiate through him prior to either a meeting with you here or our coming to Sweden

with the new president, Mr. William Galvin sometime at the end of September or beginning of October.

Meanwhile, your thoughts for a working arrangement regarding pricing of units for our marketing in the United States and other parts of the world are desired and also an indication of a formula for your marketing in Scandinavia and for the Eastern Bloc as per the original discussions or possibly even more extensively in Europe.

It is difficult in a letter to go into all the ramifications and facets so I feel that your initial reply should indicate what the status is at the moment and how fast you can move.

There is also the possibility of your having the rights to the all ultrasonic unit which we have finally finished and are now packaging for production. We solved the problem by using pulse with coating of the sonic frequency, tell Veine.

I am very much looking forward to seeing you soon either here or there, but at least let me hear from you one way or the other.

Warmest personal regards.

*Id.*

Although Persson testified that he first met Galvin "in the late summer of 1973," T. 280, he had certainly been in contact with him in July, since he gave him Eriksson's address, and Galvin wrote Eriksson on July 13, 1973, Plaintiffs' Exh. 1. Furthermore, the tentative date for a meeting at the end of September or beginning of October referred to by Lester in his letter of July 2, 1973 to Eriksson, Defendants' Exh. G, must have been known to Galvin on July 13, 1973 when he wrote:

By the time you receive this letter, we trust that you will have heard directly from Mr. Persson.

We are moving ahead rapidly in the development of a working model of the pure ultrasonic paging and locating system and we have already sold one such system to a hospital in Miami, Florida. In addition, we have made substantial progress in formulating our plans for distribution and sale domestically and abroad.

We look forward to your visit with us here in New York in order that we may demonstrate our ultrasonic system and discuss our plans for the future. In view of the advanced stage of our negotiations with some other European firms interested in our program, we hope that you share our sense of urgency in this matter, in the event you would like to develop a working relationship with us.

Plaintiffs' Exh. 1.

In any event, on August 13, 1973 Galvin wrote Persson confirming that RD would demonstrate the ultrasonic locating system for Eriksson and Persson "during the week of September 3rd in New York City." Apparently this date was changed thereafter, and the initial meeting between Eriksson and the defendants did not take place until September 12, 1973.

The meeting of September 12, 1973 was held at the Radix office at 375 Park Avenue, New York City, which was also the office of RD. Eriksson arrived around 2:00 P.M. accompanied by Persson, who had met Eriksson at the airport. Awaiting them were Galvin, Schoenheimer and LeLandais. Feldstein from Prototype was there with the demonstration equipment. Irving Kram, a potential investor, was also present. The meeting lasted until late in the evening. Apparently Galvin and his associates had incorrectly identified and associated Eriksson with L. & M. Eriksson of Sweden, a very substantial enterprise, and Eriksson corrected this misapprehension and explained that it would be easier to deal with him as the sole owner of a company than with a huge corporation. He gave his general background and his success in the manufacture of paging equipment in Europe, pointing out that he was a member of the European Selective Paging Association (ESPA) formed by all the large paging equipment companies in Europe, which membership would give him the opportunity to market Trakatron to all that group. He also told them that he was familiar with the field of ultrasonics and had had dealings with Lester in the past.

After this preliminary discussion the matter of an agency or a licensing agreement was explored. Galvin, knowing nothing about licensing, limited himself to his own field, salesmanship, and dwelt on what he, Schoenheimer, and LeLandais envisioned for RD. Thereafter, most of the conversation emanated from LeLandais and Schoenheimer, particularly LeLandais, who was a hard bargainer and experienced in licensing. During the course of the meeting Eriksson was furnished with one of the copies of the Report discussed above. He examined the Report, and at the conclusion of the meeting he took it back to his hotel where he read it in its entirety, including all the financial material. But the most interesting thing to Eriksson about the Report was "to see what people I had to deal with." T. 17. This was because his interest was in licensing or a sales agency, not in an investment.

Although Eriksson and Persson were somewhat evasive in their testimony, it is abundantly clear that the Trakatron was demonstrated by Feldstein at the meeting and that Feldstein also participated in the general conversation on a technical level. The attempt by Eriksson and Persson to fix the date of the demonstration at some time after Eriksson's investment in RD cannot survive scrutiny. There is abundant testimony and documentary evidence to support the finding of a demonstration on September 12, 1973. The Trakatron was demonstrated and proved that it was possible to send and receive a pure ultrasonic sound, but it was far from a complete success. Eriksson testified that he "thought it was a far way to go before anything could be delivered." T. 45.

It cannot be disputed that the sole purpose of the meeting on September 12, 1973 was a demonstration of Trakatron nor is it disputed that Eriksson came to New York without the slightest intention of investing in RD. As he testified at the trial, "I was not coming here for investment in that company at that time. I was coming to get a sales agency or a licensing for Europe. That was my purpose." T. 18. His sole purpose was to secure the right to market

Trakatron in Europe and, incidentally, to sell in America his radio frequency (RF) system in combination with the ultrasonic system invented by Lester and owned by RD. Persson had written to him on July 2, 1973 that Radix, i. e., RD, was ready to purchase from Eriksson "a RF/Ultrasonic locating system for demonstration" if it was available, Defendants' Exh. G, and Eriksson was aware that time was running out on the Cedars of Lebanon contract. Indeed, the time limitations of that contract were discussed, and Eriksson brought up the possible use of an RF/Ultrasonic system at this first meeting because of this time problem.

After the meeting had concluded in the evening of September 12, 1973, Galvin, LeLandais, Schoenheimer and Kram met downstairs in 375 Park Avenue at the Brasserie Restaurant. The RD group was in a quandary as to how they should proceed. Eriksson wanted an exclusive agency or licensing agreement for Europe, but did not want to pay any fee or royalty. They were greatly impressed with Eriksson; they had been looking for a "real live, interested, knowledgeable person," T. 256; and they had to act promptly since he was returning to Europe to attend a meeting of ESPA at which he desired to disclose his acquisition of the European rights to Trakatron. Although an investment by Eriksson was not discussed at the meeting on September 12, 1973, there had been talk generally about the possibility of Radix getting financing for RD, and Kram was probably introduced to Eriksson as a potential investor. It is also probable that Eriksson was shown a copy of RD's financing plan which called for raising $250,000 through the sale of 2,500 shares at $20 per share plus $200,000 of 8% Subordinated Notes payable in five years. Plaintiffs' Exh. 25. After Eriksson and Persson had left and Schoenheimer, Galvin, LeLandais and Kram had gone down to the Brasserie, LeLandais suggested they they ask Eriksson to "join the team" on a similar basis to their own initial investment in "the ball club" and using the same form of investment. T. 257. A figure of $50,000 was suggested as not unreasonable

since Eriksson would not be going in at the same time as the original investors. Moreover, this amount was what they had hoped Kram would invest.

The next morning, on September 13, 1973, by prearrangement Galvin met Eriksson and Persson for breakfast at the Brasserie. When Eriksson had left the building the prior evening he did not know whether he would get the agency or not. At breakfast they reviewed the meeting of the prior day, and Eriksson said he felt that they were close to a worthwhile association, but that the problem was LeLandais who was insisting on a minimum guarantee. Galvin told Eriksson that he would have an opportunity to purchase stock in RD in a fashion similar to Galvin's original investment, that it would be an indication of good faith on the part of Eriksson and that they would make him a member of the team. Following breakfast they went up to the Radix offices, Schoenheimer arriving at about the same time. LeLandais was not present since he was attending a directors' meeting in Connecticut. Schoenheimer and Galvin again suggested that if Eriksson wanted an agency he should show his sincerity and good faith by investing in RD. Galvin showed Eriksson a letter addressed to Eriksson on RD's letterhead which advised him that RD had accepted his offer to subscribe to 500 shares at $20 per share and a $40,000 8% three-year Subordinated Note at face value. Plaintiffs' Exh. 6. This letter had been prepared by Galvin earlier that morning after talking with LeLandais on the phone. The letter contained the following statement.

> As you are aware, at this time, our Company is accepting subscriptions from other investors upon the same terms and conditions for an aggregate of 2,500 shares of common stock and $200,000 principal amount of Notes.

*Id.*

The letter also included a statement restricting transfer of the stock "in order to comply to the Rules and Regulations of the Securities and Exchange Act, as amended." *Id.* Eriksson signed the letter, although he never inquired about the capitalization of RD and never inquired, either on September 13 or on the prior day, as to the identity of any other potential investors or the amount which they individually would be asked to invest. Nor did Eriksson or Persson at any time prior to Eriksson's investment in RD ask to be shown the books of RD. Eriksson did not read the investment letter which he signed at 375 Park Avenue on September 13 until after he had made his investment and had returned to his hotel. T. 31. Nor did he rely upon any statements which were contained in the investment letter. He admitted at the trial that it would not have mattered to him what the letter said. Plaintiffs' Exh. 6; T. 112. He received what he really wanted, the European agency. After having signed the investment letter and given his personal check for $50,000 he requested and received the grant to Teleric S.A. ("Teleric"), his personal holding company, of a general agency to introduce, market, and distribute RD's ultrasonic devices in Europe. Plaintiffs' Exh. 8; T. 32, 260. Eriksson himself dictated the agency letter which he intended to produce at the coming meeting of ESPA.

Eriksson, however, did not advise RD of the names in which the stock and note were to be put, nor did he make any suggestion as to the delivery. The promissory note, dated September 30, 1973 and payable to Teleric S.A. in accordance with Eriksson's subsequent instructions, was prepared some time after the meeting of September 13 by LeLandais and signed by him and by Galvin. It was dated September 30, 1973, as was a copy of the covering letter addressed to Teleric which bears Eriksson's signature acknowledging receipt. The original letter bearing LeLandais's signature was not produced nor was any stamped envelope. Plaintiff's Exhs. 11 and 12. LeLandais was not sure whether it was sent to Teleric by mail or handed to Eriksson on one of his trips to New York. The reason for the delay in delivery was that LeLandais thought that they were dealing with Eriksson or Telekontroll and awaited information from Eriksson not only as to the name of

the payee but also for information about Teleric, a company with which he was unfamiliar. There is evidence that Eriksson delivered the note in Switzerland personally to Dr. Renggli, the sole director of Teleric, in late 1973 or early 1974. T. 40, 127–28. However, he never delivered the covering letter which restricted the use of the note. T. 351. The covering letter of September 30, 1973 was addressed to Teleric, not Eriksson, but receipt was acknowledged not by Renggli, who would presumably have received it if it had indeed been mailed, but by Eriksson. Plaintiffs' Exh. 12. It can be inferred, therefore, that Eriksson received the note in New York on some date on or after September 30, 1973, possibly on October 10, 1973, at which time he acknowledged receipt of the note. He thereafter brought the note with him to Switzerland and delivered it to Renggli, telling Renggli for the first time about the circumstances surrounding the issuance of the note. T. 128. The Court concludes that there is insufficient proof of mailing of the promissory note, particularly in view of Eriksson's presence in New York in October. T. 93.

With respect to the RD stock, Plaintiffs' Exh. 15, which Eriksson "purchased," there is no evidence that he ever requested delivery of the certificate before he instituted this law suit. Eriksson admitted he never received it and that it was discovered by his counsel in the files of Lester's patent attorney. T. 48.

The meeting of September 13 concluded after lunch. Eriksson, before leaving for Europe, offered to use his engineering staff to install the hybrid RF/Ultrasonic system in Cedars of Lebanon Hospital in place of the pure ultrasonic system contracted for. Soon after the meeting of September 13, 1973, Galvin wrote Eriksson in Sweden telling him of his pleasure in meeting him, and stating that "we all look forward to a pleasant and profitable relationship." Plaintiffs' Exh. 9. He advised Eriksson that he was then gathering all of the technical data in Florida to forward to him, and asked Eriksson to send as much literature as he had describing his capability and products, so that they could get to know more about

each other and "start to assemble a brochure that will describe the RF/Ultrasonic System." *Id.* Eriksson had a telephone conversation with Schoenheimer in London shortly after returning to Europe, at which time Eriksson expressed doubts as to the ability to complete the hospital contract on time. T. 112–13; Plaintiffs' Exh. 10.

On October 10, 1973 Eriksson returned to New York, and he went down to Miami on October 16 and 17 to visit Cedars of Lebanon Hospital. He was in New York again on October 21 and attended a meeting at the RD office on October 23, 1973. T. 357. On his visit to the hospital in Miami Eriksson brought two of his engineers and examined the layout. T. 263. Shortly after the meeting in New York on October 23, 1973 Galvin wrote Eriksson's engineers in Sweden and requested from Telekontroll a quotation to supply and develop the entire RF/Ultrasonic system. Plaintiffs' Exh. 14.

However, by December 1973 the continuation of RD as a viable entity became doubtful, at least so far as Galvin was concerned. Galvin was on his way to Europe to confer with Eriksson and got into an argument on the phone with LeLandais about expenses. T. 272–73. He communicated his concern to Eriksson, who was now a director of RD, when he saw him in Sweden. While in Sweden he delivered transducers to Eriksson for use in the RF/Ultrasonic system, and Eriksson produced a demonstration unit which Galvin subsequently demonstrated to the New York City Board of Education. T. 275. The friction which appears to have developed between Galvin and LeLandais grew to include Schoenheimer and culminated in a stormy directors meeting on April 3, 1974 attended by, among others, Eriksson, Galvin, Schoenheimer and LeLandais. Thereafter Schoenheimer and LeLandais resigned at directors, although Eriksson, who still had confidence in the RF/Ultrasonic system, tried to calm everybody down. T. 61. There is little that need be added, except to note that RD was dissolved on December 7, 1976 after the institution of this litigation. Plaintiffs' Exh. 23.

## DISCUSSION

The second amended complaint in this action contains seven causes of action denominated as "counts." However, the Court heretofore dismissed count seven, so that only the first six counts are justifiable. Four of these—three federal securities law claims and one state statutory claim—allege the same oral and written misrepresentations and omissions of material facts that will be considered together below. The plaintiffs have also charged the defendants with violating federal securities registration provisions. Finally, they claim that RD is in default on the $40,000 note that was given to Eriksson.

The Court concludes that the plaintiffs' section 12(1) claim—failure to register—is barred by the statute of limitations and that the evidence fails to establish a violation of section 12(2) of the Securities Act, section 10(b) of the Securities Exchange Act, or section 352-c of the New York General Business Law (McKinney 1968). This deficiency in the proof, as well as the dubious status of a private right of action under section 17(a) of the Securities Act, also renders this claim meritless. The plaintiffs are, however, entitled to judgment on the note.

*Section 12(1)*

Section 12(1) of the Securities Act provides, in part, that "[a]ny person who . . offers or sells a security in violation of section 5 . . . shall be liable to the person purchasing such security from him . . . [for] the consideration paid for such security . . . upon the tender of such security." Generally, section 5 forbids the use of any means of interstate commerce or of the mails to sell or offer to sell securities without having first filed a registration statement with the Securities and Exchange Commission.[1]

Eriksson argues that the defendants clearly violated section 5 because the securities they sold to him were unregistered. Having tendered the note and stock to the defendants, he seeks to recover the $50,000 that he paid for them. The defendants raise two defenses to Eriksson's section 12(1) claim: (1) the sale was a private offering exempt from registration requirements; and (2) the claim is barred by the statute of limitations. While the Court rejects the defendants' exemption argument, it agrees that the claim is time-barred.

■ Section 4(2) of the Securities Act states that the provisions of section 5 do not apply to transactions "not involving any public offering." To determine whether an offer or sale of securities is a private transaction exempt from section 5, a court must examine whether the offerees needed the protection that registration would afford and whether they had access to the kind of information that registration would disclose. *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 125–27, 73 S.Ct. 981, 984–985, 97 L.Ed. 1494 (1953); *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680, 687–91 (5th Cir. 1971). This inquiry applies to every offeree, *Lively v. Hirschfeld*, 440 F.2d 631, 633 (10th Cir. 1971), and the defendant bears the burden of establishing that the transaction is covered by the exemption. *S.E.C. v. Ralston Purina Co., supra*, 346 U.S. at 126, 73 S.Ct. at 985.

1. Section 5 provides, in part:
    (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
    (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
    (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

    (c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

■ The Court finds that these defendants have not successfully carried this burden of proof. While Eriksson himself might qualify as a proper private offeree, "[t]he testimony as to all other offerees was woefully short of the requirement." *Lively v. Hirschfeld, supra* at 633. The defendants presented little or no evidence regarding the individuals included on their list of potential investors who were contacted by Radix with a view toward investing in RD. Plaintiffs' Exh. 24. Only a handful of these people were described at the trial. T. 334–38. Schoenheimer's testimony that the Report about RD was made available to all potential investors, T. 337, does not guarantee that they had access to all of the information a registration statement would have provided. *See S.E.C. v. Continental Tobacco Co.*, 463 F.2d 137, 160 (5th Cir. 1972). In short, the defendants failed to prove that "*as to all offerees* there was a lack of public need for registration and the protections of the Act." *Id.* (emphasis in original). In light of the dearth of evidence presented on this issue, the Court holds that the defendants failed to discharge their burden of establishing the private offering exemption.

Section 13 of the Securities Act provides that an action to enforce a liability created by section 12(1) must be brought within one year after the violation upon which it is based occurred. 15 U.S.C. § 77m. The securities at issue here were offered and sold to Eriksson on September 13, 1973. This action was commenced on September 16, 1974, more than one year after the sale was made. Asserting that "case law clearly demonstrates that the statute of limitations does not commence until delivery of the securities and completion of the sale," the plaintiffs contend that their claim is timely because "the Note in question was delivered at the earliest on September 30, 1973, and the stock certificate was never delivered." Post-Trial Memorandum of Law at 17. The Court, however, is constrained to disagree.

The plaintiffs' complaint and second amended complaint in this action refer repeatedly to the allegedly unlawful offer and sale of securities that occurred on September 13, 1973. As plaintiffs concede, the September 30th delivery date is nowhere to be found among their extensive allegations. At the close of the trial, plaintiffs moved, pursuant to Federal Rule of Civil Procedure 15(b) [2] ("Rule"), to conform the pleadings to the proof on the grounds that the issue of the delivery date was tried before the Court without any objection by the defendants as to the relevance of that date. While indicating that the plaintiffs were probably foreclosed from making such a change, the Court reserved decision on the motion. T. 363. For the reasons discussed below, that motion is hereby denied.

■ The plaintiff in a securities action must plead and prove facts demonstrating compliance with the statute of limitations. *Goldstein v. Regal Crest, Inc.*, 59 F.R.D. 396, 403 (E.D.Pa.1973). "[C]ompliance with the limitations section [is] an essential ingredient of a private action which must be affirmatively asserted." *Newberg v. American Dryer Corp.*, 195 F.Supp. 345, 352 (E.D.Pa.1961) (citations omitted). The plaintiffs' reliance on cases holding that "the relevant inquiry [is] which of the defendant's activities—offer, sale, or delivery—occurred last as that [is] the time from which to measure the limitation period" is therefore misplaced. *Doran v. Petroleum*

---

**2.** Rule 15(b) provides:

Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

*Management Corp.,* 576 F.2d 91, 93 (5th Cir. 1978); *see Buchholtz v. Renard,* 188 F.Supp. 888, 892 (S.D.N.Y.1960).

■ The plaintiffs' section 12(1) claim alleged only an unlawful offer and sale. While section 5(a)(2) does prohibit the after-sale delivery, through interstate commerce, of an unregistered security, the unlawful delivery is a distinct violation. As stated by the court in *Goldstein v. Regal Crest, Inc., supra,* 59 F.R.D. at 403 n. 5, "[t]he offense of 'delivery after sale' is separate from 'sale', which is the offense alleged here." Similarly, in *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1054 n. 7 (2d Cir. 1969), the Second Circuit stated that "since the claim against appellees is for offering rather than selling, the date when [the appellant] acquired full dominion over the stock is scarcely relevant." The Court also noted that "delay in mailing the certificates does not extend the period of limitation." *Id.* *See also Mason v. Marshall,* 412 F.Supp. 294 (N.D.Tex.1974), *aff'd,* 531 F.2d 1274 (5th Cir. 1976) (offer and sale violations each have their own statute of limitations).

In *Rochambeau v. Brent Exploration, Inc.,* 79 F.R.D. 381 (D.Colo.1978), the court rejected the plaintiff's argument that his securities action was not time-barred because a "continuing violation" had occurred until the date of his last payment. The violation claimed was based on the sale of an interest in an oil and gas lease by an agreement dated June 24, 1976. Holding that the limitations period must be measured from that date, the court stated that "the rights and obligations of the parties were fixed by that agreement and were thereafter governed by that agreement, no

matter what course of action either chose to take." *Id.* at 384.

■ The violation claimed in the case at bar is based on the September 13th letter agreement signed by Eriksson. That agreement, which provided for the purchase of RD securities and a promissory note, constituted a sale within the meaning of the Securities Act, 15 U.S.C. § 77b(3), and was immediately enforceable under N.Y.U.C.C. § 8–319 (McKinney 1964).[3] *See Mason v. Marshall, supra,* 412 F.Supp. at 299. The transaction upon which the plaintiffs' claim is based was thus completed on September 13, 1973, and the statute of limitations began to run on that date.

This conclusion is consistent with the observations of the court in *Bryant v. Uland,* 327 F.Supp. 439 (S.D.Tex.1971). After conducting an extensive review of the statute of limitations defense in these kinds of securities actions, the court stated:

The violation which commences the running of the statute must be the first violation. Otherwise, the statute of limitations would be rendered meaningless. This is particularly true where, as in the present case, the plaintiff has control over succeeding violations, i. e., by making further installment payments.

A close look at the cases reviewed above will show that the courts found it necessary to look at later stages of the transaction, such as payment or delivery, to find a violation because all previous stages of the transactions in question were carried on intrastate and were not in violation of the Act. One cannot conclude from these cases that if each successive stage of the transaction violates

---

**3.** Section 8–319 provides:

'A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

(b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

(d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

the Act the statute of limitations expands concomitantly.

*Id.* at 447.

The *Bryant* court relied in part on the case of *Athas v. Day*, 186 F.Supp. 385 (D.Colo.1960), in which the plaintiffs attempted to avoid the time limitation by asserting that various acts, presumably essential to the completion of the sale, extended the final sale date. The court stated that the statutory violation alleged was the sale of the unregistered securities, and the facts clearly established that the sale was completed more than a year before the commencement of the action. Accordingly, the court ruled that "[i]t would be a perversion of the requirements and purpose of the Act to permit such elasticity." *Id.* at 388.

Although leave to amend pleadings should be freely given when justice requires, the trial judge's discretion is broad and its sound exercise usually depends on the presence or absence of such factors as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). See also *Freeman v. Marine Midland Bank-New York*, 494 F.2d 1334, 1338 (2d Cir. 1974); *Scranton Volunteer Fire Co. v. U. S. Fidelity & Guaranty Co.*, 450 F.2d 775, 777 (2d Cir. 1971); *Mooney v. Vitolo*, 435 F.2d 838 (2d Cir. 1970).

*Browning Debenture Holders' Committee v. Dasa Corp.*, 560 F.2d 1078, 1086 (2d Cir. 1977). The complaint in this action has been amended twice; all three versions allege only an unlawful sale on September 13th and do not describe subsequent events. The defendants have relied on the statute of limitations defense since the commencement of this action. Had they been aware that that defense would be unavailable, they might have relied more heavily on the private offering exemption and bolstered their proof on that issue. Furthermore, in light of the Court's conclusion that the evidence indicates that the Note was personally delivered to Renggli by Eriksson, and not mailed by the defendants, it is possible that the delivery itself would not satisfy the "use of the mails or interstate commerce" requirements of the Securities Act. *See* n.1 *supra.*

The Second Circuit has asserted that "the most important question" in a motion under Rule 15(b) is "whether the defendant 'would be prejudiced by the implied amendment, i. e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory.' " *Id.*, quoting 3 Moore's Federal Practice ¶ 15.-13[2], at 993 (2d ed. 1966). This Court is not satisfied that the proposed amendment would be without prejudice to the defendants. Nor can the plaintiffs' eleventh hour request to conform the pleadings to the proof be reconciled with the rule that compliance with the statute of limitations is an essential element of the claim that must be affirmatively asserted. Accordingly, the plaintiffs' Rule 15(b) motion is denied and the section 12(1) claim is barred by the statute of limitations.

*Section 12(2)*

Section 12(2) of the Securities Act provides:

Any person who

offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable

care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him . . ..

15 U.S.C. § 77*l*(2). An action based on this provision must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *Id.* § 77m. The plaintiff need not prove reliance on the alleged misrepresentations to recover under section 12(2). *Hill York Corp. v. American Int'l Franchises, Inc., supra,* 448 F.2d at 696; *John Hopkins University v. Hutton,* 422 F.2d 1124, 1129–30 (10th Cir. 1970). However, when liability is based on a sale, as opposed to an offer of securities, the Second Circuit has held that there must be "some causal relationship between the challenged communication and the sale, even if not 'decisive.'" *Jackson v. Oppenheim,* 533 F.2d 826, 830 n.8 (2d Cir. 1976). According to the *Jackson* court, "the communication must have been intended or perceived as instrumental in effecting the sale." *Id.* After reviewing the misrepresentations and omissions alleged by the plaintiffs in the case at bar, the Court concludes that this causation requirement has not been satisfied.

The source of such misrepresentations and omissions are identified as the Report of July 19, 1973, (*see* Second Amended Complaint ¶¶ 4(h) and 13); the letter of September 13, 1973 addressed to Eriksson on RD's letterhead, Plaintiffs' Exh. 6, advising him of RD's acceptance of his offer to subscribe to the RD shares and note; "and the oral representations of Galvin, Schoenheimer and LeLandais," Second Amended Complaint ¶ 13. The alleged misrepresentations of material fact are alleged as:

(a) the capability of [RD] to produce the type of communications equipment described in the Report;

(b) the marketability and profitability of the type of communications equipment described in the Report;

(c) the capability of [RD] to perform under a certain contract between [RD] and the Cedars of Lebanon Hospital in Miami, Florida which contract was included in the Report and which defendants Galvin, Schoenheimer and LeLandais represented to be worth One Hundred Thousand Dollars ($100,000.00) in net profit to [RD];

(d) the availability to [RD] of major equity capital funds through other investors;

(e) the purported uses for the monies plaintiff was investing in [RD];

(f) the financial stability of [RD];

(g) the risks of Eriksson's investment;

(h) the existence of investors then willing to subscribe to securities identical or similar to those purchased by plaintiff; and

(i) the capitalization of [RD].

Second Amended Complaint ¶ 13.

The alleged omissions of material facts attributed to the Report, to the letter of September 13, 1973 and to the representations of Galvin, Schoenheimer and LeLandais are:

(a) the inability of Galvin, Schoenheimer, and LeLandais to function together as managers and directors of [RD];

(b) the inability of [RD] to manufacture the main product described in the Report, that is, a pure ultrasonic paging system, and known as Trakatron;

(c) the non-existence of a working prototype model of the pure ultrasonic Trakatron;

(d) the difficulties being encountered in attempting to obtain certain patents necessary to the development of Trakatron.

Second Amended Complaint ¶ 14.

Let us examine these charges of misrepresentation and omission and Eriksson's allegations that he "through no neglect on his part, had no reason to believe that the statements of material facts and omissions [as set forth above] were false and misleading and his reliance thereon was reasonable," and that had he been aware of the

truth, "he would not have purchased these securities." Second Amended Complaint ¶ 17.

The evidence clearly establishes that Eriksson was fully familiar with Lester's ultrasonic system patent and with the Trakatron equipment long before Galvin first approached Recognition Devices with a view to acquire Lester's patent and take over that company. In October 1972, Eriksson and Lester conferred in Sweden regarding a patent licensing agreement between Telekontroll and Recognition Devices whereby Telekontroll would manufacture the Trakatron systems for the European market and conceivably for the entire world. This agreement never reached fruition, and the implication is clear that Eriksson's aversion to an advance payment of royalties or licensing fees was a major factor in stalling further negotiations. Eriksson did succeed in obtaining a temporary right to build a prototype of the Lester patent and indeed did just that in late 1972 or early 1973. After Eriksson's conference with Lester Galvin went to see Lester at the suggestion of Bronstein, president of Cedars of Lebanon Hospital, who was also a stockholder of Lester's company, Recognition Devices. Before Eriksson chose to resume negotiations with Lester, the patents, other assets, and the corporate name had been transferred from Recognition Devices to RCDS, a corporation formed by Galvin and the other defendants. Eriksson was apparently unaware of this change of ownership until his friend Persson and Lester sent him a joint letter in early July 1973. Persson misinformed Eriksson by advising him that the purchaser of Lester's company was Radix which he describes as "a mini-conglomerate with an annual business of between $15–$20 million a year." Defendants' Exh. G. He also stated that Radix desired to purchase from Eriksson an RF/Ultrasonic locating system, if then available, for demonstration purposes since Radix believed it had potential customers lined up for Eriksson. Lester then continued the letter, mentioning a possible meeting between Galvin and Eriksson, and soliciting Eriksson's thoughts for a working arrangement regarding the pricing of units for marketing in the United States. Although Lester was then acting for RD as a consulting engineer, he gratuitously informed Eriksson that there was a possibility of Eriksson's "having the rights to the all ultrasonic unit which we have finally finished and are now packaging for production." Finally, he advised Eriksson how RD had solved the problem with the ultrasonic unit. *Id.*

Therefore, when Eriksson appeared at the RD office on Wednesday, September 12, 1973, he was no innocent abroad on the subject of the capability of RD to produce the ultrasonic unit described in the Lester patent, or its marketability and profitability. He had built a prototype almost a year before, and he knew that Lester, the inventor, was working with RD as a consultant. Moreover, Eriksson has admitted time and time again that he did not come to New York to invest any money in RD, but rather to attend a demonstration of the Lester ultrasonic unit and to secure an agency or licensing agreement from RD to produce and market the unit in Europe, without initial cost to himself, if possible. He was so sure of the success of the unit that he continued his efforts to acquire a license or agency even after the demonstration on September 12 was far from a complete success. At no time during the meeting of September 12 did anybody suggest to Eriksson that he invest a penny in RD. Indeed, Eriksson's time was spent primarily in an unsuccessful attempt to convince LeLandais, who had previous licensing experience, that RD should give him a license or agency without any prepayment of royalties or fees.

At the meeting on September 12, 1973 Eriksson was given a copy of the Report, which Eriksson labels as a prospectus, although it nowhere "offers any security for sale or confirms the sale of any security." 15 U.S.C. § 77b(10), was not delivered to Eriksson at the time any sale was contemplated, and was prepared prior to July 19, 1973, nearly two months before the meetings of September 12 and 13, 1973. Eriksson has not shown what representations in

the Report as to the capability of RD to produce, or as to the marketability and profitability of the ultrasonic unit, are false either as of July 19 or September 13, 1973. Even had they been false, he neither was misled nor did he rely on them. Eriksson's claim that he was misled about the capability of RD to perform its contract with Cedars of Lebanon Hospital is totally without foundation. The Report which contained a copy of the contract with the hospital clearly specified that Phase I was to be completed by September 1, 1973—almost two weeks before the meeting of September 12—and that the entire contract was to be completed by March 1, 1974. Eriksson admitted in his testimony that at the initial meeting on September 12, 1973 he doubted the ability of RD to comply with the time schedule, and it was he who suggested a switch from the pure ultrasonic system to a hybrid system combining Eriksson's radio frequency system with Lester's ultrasonic system. Furthermore, there is no evidence to support the insinuation that the projected profit of $100,000 was a false representation.

Next let us consider the alleged misrepresentations as to other investors who were prepared to participate. The Report itself nowhere contains an offer to sell securities and was not delivered to Eriksson in connection with any sale of securities but to familiarize him with RD. As already noted, it was not a prospectus under the securities laws and did not become one because Eriksson subsequently purchased securities.

The letter of September 13, 1973 from Galvin to Eriksson accepting Eriksson's offer to purchase the securities was a prospectus within the meaning of 15 U.S.C. § 77b(10). Eriksson labels as a misrepresentation the statement "As you are aware, at this time, our Company is accepting subscriptions from other investors upon the same terms and conditions . . . ." However, this is not a representation that the Company had accepted subscriptions, but that it was prepared to accept such subscriptions. One of those who attended the demonstration on September 12, 1973 was Kram, a potential investor. Moreover, Eriksson never read the letter of September

13 until after he had delivered his check for the securities and the meeting had ended. T. 31. He was not interested in the contents of the letter and admitted that it would not have mattered to him what it said. T. 112.

It is also charged that there were misrepresentations about the risks of Eriksson's investment. What these misrepresentations were does not appear from the record. Eriksson had read the Report and knew from the financial statements that as of July 15, 1973 RD was operating in the red and that if the Cedars of Lebanon contract fell through, there were no assets available to pay his note, and that the stock would be worthless. Certainly he was no less aware than were the defendants as to the risks involved.

We come next to the charge of misrepresentation as to the capitalization of RD, which has been discussed in greater detail above. It is true, at the time of the sale of the stock to Eriksson, that RD was capitalized at 200 shares no par common stock, although Galvin, LeLandais and Schoenheimer all believed it to be 15,000 shares. Thus, at the time of the purchase from Intersonics on April 2, 1973, it was assumed that the capitalization was 15,000 shares of which 10,000 constituted the original issue divided up among the Galvins, Radix, Intersonics (as part of the purchase price) and the principals of Scientific Prototype, Inc. This was reflected in the Report of July 19, 1973. The defendants clearly were not aware that their own stock was unauthorized. Once the mistake was discovered, it was rectified. Plaintiffs' Exh. 5. As already noted, Eriksson never requested delivery of the stock certificate, and the mistake regarding the original capitalization was not discovered by his attorneys until after the original action was instituted.

Finally, it is charged that the defendants misrepresented "the purported uses for the monies" Eriksson was investing in RD. It is difficult to find any support for such a charge, since Eriksson testified that "it was stated many times that my money was not

needed" and that "[i]t was only that I had to prove my sincerity that I really wanted to deal with a company like this." T. 30. Moreover, Eriksson had read the Report, which indicated the nature of the prior use of its capital by RD.

The charges of omission to include material facts in the Report, the letter of September 13, 1973 and oral or other representations of Galvin, Schoenheimer and LeLandais are equally without merit. The principal charge is that Eriksson was not informed of the inability of Galvin, Schoenheimer and LeLandais to function together as managers and directors of RD. The evidence establishes that they were working together very well at the time of Eriksson's purchase of the securities and that there was no reason for anybody to suspect there would be a falling out between Galvin on the one hand and LeLandais and Schoenheimer on the other. In the Report, the business background of each of the three is set forth in some detail, and the Report was read by Eriksson. There is no evidence that this material was in any way false or misleading. Eriksson apparently recognizes this, and therefore does not charge a misrepresentation of fact, but rather a failure to reveal a falling-out among the co-venturers which was not to occur until some months after the sale.

Further charges of omission to reveal material facts deal with the inability of RD to manufacture the ultrasonic system, and the nonexistence of a prototype model of such a system, Second Amended Complaint ¶ 14(b) and (c). What has been said heretofore about Eriksson's superior knowledge in this field, including his having created a working prototype himself, reveals the absurdity of these claims. Indeed, there has been no showing that RD was unable to manufacture such a system. It did not proceed further since Eriksson, at the time of his purchase of the securities, was urging RD to convert to a hybrid RF/Ultrasonic system. Finally, the charge that RD concealed its difficulty in attempting to obtain certain patents necessary to the development of the ultrasonic system finds no support in the record.

One further observation. Even were there substance to these charges of misrepresentation and omission, it is difficult to accept Eriksson as an investor in RD. He came to New York with one objective, to secure an agency or licensing agreement which he could exploit throughout Europe. He was in a hurry because the ESPA would be meeting shortly and his possession of such an agreement could be announced at that meeting. However, LeLandais's insistence on a down payment offended Eriksson who considered himself the leader in the industry, and he went back to his hotel on the night of September 12, 1973 with a copy of the Report and nothing more. On September 13 LeLandais was away, and Eriksson was suddenly informed that he could have the agency agreement, but that as an indication of his good faith in the enterprise he should purchase the stock and note just like the other members of the team, although in the case of the stock at a substantially higher figure. He wrote out his check, although he was told that it was not necessary and could await his designation of the names in whom the securities were to be issued, and he went home with what he had come for in the terms that he had dictated—the agency agreement, unlimited as to time and absent any advance payment or other financial conditions.

The foregoing review of the facts in this case clearly demonstrates that Eriksson failed to establish the requisite "causal relationship" between the challenged communications and his purchase of the RD securities and note. *See Jackson v. Oppenheim, supra,* 533 F.2d at 830 n.8. The *Jackson* court's ruling that causation was not established in that case was based on the trial court's findings that (1) the plaintiff purchaser bought the securities notwithstanding the defendant seller's warnings about the issuer's financial difficulties and managerial incompetence; (2) the defendant neither made any representations nor directly offered to sell securities to the plaintiff; and (3) the plaintiff would not have altered his conduct even if he had seen the defendant's memorandum recommending corpo-

rate changes deemed necessary to prevent bankruptcy. *Id.* at 830. Eriksson and Teleric contend that "[t]he factual differences between the *Jackson v. Oppenheim* case and the instant case are too obvious to ignore." Post-Trial Memorandum at 22. They assert that Eriksson, unlike Jackson, had no connection with the issuer prior to the sale and received no negative information concerning RD. While the Court is not blind to the distinctions between the cases, it does not find the plaintiffs' argument persuasive. Eriksson had substantial connections with RD's product through his relationship with Lester, his experience in the field, and his construction of a prototype based on Lester's patent. From reading the Report, Eriksson knew that the company was not currently operating at a profit and was depending on the Cedars of Lebanon contract to put it on its feet. He testified that after seeing the Trakatron demonstration he "thought it was a far way to go before anything could be delivered," T. 45, and doubted that the contract could be completed on time. These realizations, however, did not dissuade Eriksson because he truly wanted to obtain an agency agreement before the ESPA meeting and was willing to pay out the cash. The Court concludes, as in *Jackson*, that neither the challenged communications nor the so-called omissions were responsible for the plaintiff's conduct.[4] "[T]here was an abundance of evidence of the matters the plaintiff really considered important in entering this face to face transaction," *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975), and Eriksson was well aware of the opportunities and risks inherent in his agreement with the defendants. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978); *Spielman v. General Host Corp.*, 538 F.2d 39, 41 (2d Cir. 1976). Accordingly, a section 12(2) claim has not been established because the alleged misrepresentations and omissions were not "instrumental in effecting the sale." *Jackson v. Oppenheim, supra*, 533 F.2d at 830 n.8.

*Section 10(b)*

The plaintiffs' section 10(b)[5] and rule 10b-5[6] claims are based on the same allegations, described above, that charge

---

4. The plaintiffs' reliance on footnote 10 of the *Jackson* opinion is misplaced. The court there distinguished between liability based on an offer to sell securities and liability based on a sale, *see Jackson v. Oppenheim, supra*, 533 F.2d at 830 n.8 ("Where liability is not based on an *offer* containing a misleading communication, *see* note 10 *infra* . . . .") (emphasis in original). With respect to the former, the court stated:

The situation is entirely different, of course, where liability is based on a misleading prospectus constituting an offer of sale. In such cases liability may be based on the misleading "offer" by prospectus even though the prospectus is mailed after the confirmation of the sale.

*Id.* n.10 (citation omitted). In the case at bar, liability is clearly based upon the *sale* of securities. The plaintiff must therefore demonstrate "some causal relationship" between the alleged misrepresentations and omissions and his decision to purchase the RD stock and note. *Id.* at 830.

5. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

6. Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

the defendants with various misrepresentations and omissions. The essential elements of a private cause of action for damages under section 10(b) and rule 10b–5 include: a material misrepresentation or omission, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); some causal relationship between the alleged violation and the injury suffered by the plaintiff as a result of the fraudulent scheme, *id.* at 154, 92 S.Ct. at 1472; *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 238 (2d Cir. 1974); and scienter—an intent to deceive, manipulate, or defraud the plaintiff—on the part of the defendant, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194–97, 96 S.Ct. 1375, 1381–1383, 47 L.Ed.2d 668 (1976). When a claim alleges a material omission, positive proof of reliance is not required, for reliance may be inferred upon a showing of materiality. *Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 153–54, 92 S.Ct. at 1472. In *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Supreme Court defined the standard for materiality as "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder," or, putting the matter another way, "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." While the *Northway* case involved omissions from proxy materials alleged to constitute a violation of section 14(a), 15 U.S.C. § 78n(a), the Second Circuit has applied this standard in section 10(b) cases. *See, e. g., Joyce v. Joyce Beverages, Inc.,* 571 F.2d 703, 707 n.6 (2d Cir. 1978); *Goldberg v. Meridor,* 567 F.2d 209, 218–19 (2d Cir. 1977). In addition, the Second Circuit has held that a showing of recklessness is sufficient to satisfy the scienter requirement established by the Supreme Court in *Hochfelder. Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *see Lanza v.*

*Drexel & Co.,* 479 F.2d 1277, 1306 & n.98 (2d Cir. 1973) (en banc).

■ On the basis of the evidence reviewed above, the Court concludes that the plaintiffs have failed to establish the essential elements of a section 10(b) claim. The prior ruling—that the section 12(2) claim fails for insufficient proof of the requisite causal relationship—necessarily indicates a failure to satisfy the section 10(b) requirement of "causation in fact between the act and [the] injury." *Titan Group, Inc. v. Faggen, supra,* 513 F.2d at 239; *see Marbury Management, Inc. v. Kohn,* 470 F.Supp. 509, 514 (S.D.N.Y.1979); *Scarfarotti v. Bache & Co.,* 438 F.Supp. 199, 207 (S.D.N.Y.1977). And although causation can be established by the mere failure to disclose material facts, *Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 154, 92 S.Ct. at 1472, "there is no duty to disclose information to one who reasonably should already be aware of it." *Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), *quoted with approval in Seibert v. Sperry Rand Corp., supra,* 586 F.2d at 952; *see Jackson v. Oppenheim,* 411 F.Supp. 659, 668–69 (S.D.N.Y.1974), *aff'd,* 533 F.2d 826 (2d Cir. 1976). "The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment." *Hirsch v. du Pont,* 553 F.2d 750, 763 (2d Cir. 1977).

■ Moreover, the Court finds that the defendants did not intend to deceive, manipulate, or defraud Eriksson at any time. Their intention from the outset was to enter a business agreement that would benefit all concerned through the pooling of resources, talent, and personal connections. To determine whether the defendants acted recklessly, the Court must inquire "whether the defendants knew the material facts misstated or omitted, or failed or refused, after being put on notice of a possible material failure of disclosure, to apprise themselves of the facts where they could have done so without any extraordinary effort." *Lanza v. Drexel & Co., supra,* 479 F.2d at 1306 n.98. Measured by this standard, the Court

concludes that the defendants' conduct was neither willful nor reckless. Therefore, neither the requisite reliance by the plaintiffs, nor scienter on the part of the defendants, has been established. Accordingly, the plaintiffs have failed to prove that the defendants violated section 10(b) and rule 10b–5.

*Section 17*

■ Section 17(a)(2) of the Securities Act provides that:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

The plaintiffs' section 17 claim is based on the same alleged misrepresentations and omissions that were described above in connection with the section 12(2) and section 10(b) claims.

The existence of a private right of action under section 17(a) remains an open question. *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557 n.9, 99 S.Ct. 790, 795 n.9, 58 L.Ed.2d 808 (1979); *Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1137 n.8 (2d Cir. 1976). Courts in this district have repeatedly held that no such cause of action is available to a private plaintiff. *See, e. g., Marbury Management, Inc. v. Kohn, supra,* 470 F.Supp. at 514 n.9; *Allegaert v. Perot,* 78 F.R.D. 427, 429 (S.D.N.Y.1978); *Scarfarotti v.*

*Bache & Co., supra,* 438 F.Supp. at 207; *Architectural League v. Bartos,* 404 F.Supp. 304, 313 (S.D.N.Y.1975); *Welch Foods, Inc. v. Goldman, Sachs and Co.,* 398 F.Supp. 1393, 1399–1401 (S.D.N.Y.1974). Even if section 17(a) provided a right of action, the evidence fails to establish a violation of that provision, for the essential elements of a section 17(a) claim are identical to those under section 10(b), *Lanza v. Drezel & Co., supra,* 479 F.2d at 1280 n.2; *Jackson v. Oppenheim, supra,* 411 F.Supp. at 665, and the plaintiffs have not proved a section 10(b) violation. In short, the section 17(a) claim is without merit.

*State Claims*

In addition to claiming violations of the federal securities laws, the plaintiffs have asserted claims against the defendants based on New York law. Because this action between foreign plaintiffs and United States citizens falls within the diversity jurisdiction of this Court, these state claims may be resolved here. 28 U.S.C. § 1332. The Court may also entertain these claims pursuant to its pendent jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although no federal claim has been proved, this Court has conducted a trial on the issues and, in the interest of judicial economy, it should decide the pendent claims arising out of the same transaction challenged under federal law. *See Hilburn v. Butz,* 463 F.2d 1205, 1207 (5th Cir. 1972); *Gem Corrugated Box Corp. v. National Kraft Container Corp.,* 427 F.2d 499, 501 n.1 (2d Cir. 1970); *Superintendent of Ins. v. Freedman,* 443 F.Supp. 628, 637 (S.D.N.Y.1977).

■ The plaintiffs contend that the defendants violated section 352-c of the New York General Business Law (McKinney 1968).[7] This contention is unfounded. Sec-

---

7. § 352-c. Prohibited acts constituting misdemeanor

1. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:

(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

(b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c) Any representation or statement which is false, where the person who made

tion 352-c, printed in full below, prohibits "all deceitful practices contrary to the plain rules of common honesty." *People v. Cadplaz Sponsors, Inc.,* 69 Misc.2d 417, 419, 330 N.Y.S.2d 430, 432 (Sup.Ct.1972) (citations omitted). Although the statute is penal, it provides a private cause of action for a defrauded purchaser in a securities transaction. *Superintendent of Ins. v. Freedman, supra,* 443 F.Supp. at 637; *Barnes v. Peat Marwick Mitchell & Co.,* 69 Misc.2d 1068, 332 N.Y.S.2d 281 (Sup.Ct.1972), *modified,* 42 App.Div.2d 15, 344 N.Y.S.2d 645 (1st Dep't 1973). The elements of this cause of action are, however, uncertain. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 120 (S.D.N.Y.1974), *aff'd in part, rev'd in part,* 540 F.2d 27 (2d Cir. 1976). While a criminal violation can be established without proving an intent to defraud, *People v. Barysh,* 95 Misc.2d 616, 619, 408 N.Y.S.2d 190, 193–94 (Sup.Ct.1978); *People v. Cadplaz Sponsors, Inc., supra,* 69 Misc.2d at 419, 330 N.Y.S.2d at 432, it is unclear whether scienter is an essential ingredient of a civil claim. *See Superintendent of Ins. v. Freedman, supra,* 443 F.Supp. at 637 ("the Superintendent has not offered any authority for the proposition that the state law is in any way broader than Rule 10b-5"). But the Court agrees with the assertion of the court in *Herzfeld* that "proof of reliance in the sense of causation must be shown, for otherwise a defendant could be held liable under § 352-c even to purchasers whose damage could not be traced to his wrongdoing." *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra,* 378 F.Supp. at 130.

The plaintiffs' failure to establish the requisite causal relationship under section 12(2) or the reliance required for a section 10(b) claim renders the section 352-c cause of action meritless, for this deficiency in proof is equally fatal to the state securities law claim. *See Architectural League v. Bartos, supra,* 404 F.Supp. at 309, 313. Furthermore, the evidence does not establish that the defendants engaged in fraudulent practices or concealed important information from Eriksson. *See Jones Memorial Trust v. TSAI Investment Services, Inc.,* 367 F.Supp. 491, 498 (S.D.N.Y.1973). The plaintiffs have therefore failed to prove a violation of section 352-c of the New York General Business Law.

The final count remaining in the plaintiffs' second amended complaint alleges that "[b]y the terms of the Note, defendant RD, has defaulted on the Note and payment on the Note is due." The plaintiffs seek $40,000, the face value of the note, plus interest from September 13, 1973. Pursuant to Eriksson's instructions, the note, dated September 30, 1973, was made payable to Teleric. Plaintiffs' Exh. 11. Because Teleric held legal title to the note, the Court, in a pretrial Memorandum Order dated May 28, 1973, directed that it be joined as a party plaintiff pursuant to Rule 19(a).

While the Court agrees that RD is now in default on the note, it is a mystery how the plaintiffs would have substantiated the claim that default occurred prior to June 11, 1975, the date the second amended complaint was filed. The face of the note bears only the words Forty Thousand Dollars. On the back of the note a typed statement

---

such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made;

where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

2. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to engage in any artifice, agreement, device or scheme to obtain money, profit or property by any of the means prohibited by this section.

3. A person, partnership, corporation, company, trust or association, or any agent or employee thereof, using or employing any act or practice declared to be illegal and prohibited by this section, shall be guilty of a misdemeanor.

provides that"[i]nterest on this note shall accrue at 8% per annum and shall be payable at maturity thereof, unless this note is prepaid prior to its maturity in which event interest to such prepayment date shall be paid." *Id.* Teleric's sole director, Renggli, testified on February 23, 1976 that the note would not be due until September of that year. T. 355–56. Obviously, RD had no obligation on the note at the time the plaintiffs brought this suit.

The trial in this case took place long after September 30, 1976, and the note had certainly become due by that time. Teleric, a holder in due course, had a right to sue on the note after presentment and dishonor had occurred. N.Y.U.C.C. §§ 3–301, 3–302, 3–413, 3–501 (McKinney 1964), and is entitled to judgment against RD.[8]

### CONCLUSION

The Court has concluded that the securities transaction at issue in this case does not fall within the private offering exemption. The plaintiffs' section 12(1) claim alleging sale of unregistered stock is, however, barred by the statute of limitations. The allegations of misrepresentations and omissions of material facts are not supported by the evidence and thus fail to establish a violation of section 12(2) of the Securities Act, section 10(b) of the Securities Exchange Act, or section 352-c of the New York General Business Law. This inadequate proof, as well as the questionable existence of a private right of action under section 17(a) of the Securities Act, renders this claim meritless. The plaintiffs are entitled to judgment on the note.

Submit judgment in favor of the defendants on counts one through five of the complaint. Judgment is awarded against

RD on count six in the amount of $40,000 plus interest from September 30, 1973.

---

8. This may be merely a pyrrhic victory. RD is now defunct, having been dissolved less than three months after the note matured. Plaintiffs' Exh. 23. Furthermore, all the assets originally acquired by RD from Lester's old company (renamed Intersonics) were reassigned to that company on April 2, 1976, pursuant to the purchase agreement between the two companies, because RD had not paid Intersonics at least $100,000 of its outstanding obligation by the third anniversary date of the agreement. The Trakatron patent, for example reverted to Intersonics and in July 1976 was assigned to Eriksson by Lester, on the company's behalf, for an unrevealed consideration other than the nominal $1.00. In short, the judgment against RD is likely to remain unsatisfied, for the corporation no longer exists and the bulk of its assets were reassigned to Intersonics before the note became due.