**COLONIAL SECURITIES, INC. and Pasquale Catizone, Plaintiffs,**

**and**

**Neuberger Securities Corp., Intervenor-Plaintiff,**

**v.**

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Defendant,**

**Carl Hornung et al., Additional Defendants on Counterclaim.**

**No. 77 Civ. 1014.**

United States District Court, S. D. New York.

Dec. 13, 1978.

Gusrae, Greene & Kaplan, New York City, for plaintiffs; Bert L. Gusrae, New York City, of counsel.

Lefrak, Fischer, Myerson & Mandell, New York City, for intervenor-plaintiff; Sander Marc Rabin, Edward R. Mandell, New York City, of counsel.

Brown, Wood, Ivey, Mitchell & Petty, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith Inc., Roger J. Hawke, Thomas J. Mullaney, New York City, of counsel.

Schwenke & Devine, New York City, for additional defendants; Richard W. Lyon, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs, Colonial Securities, Inc. ("Colonial") and Pasquale Catizone ("Catizone") bring this action to recover damages resulting from two transactions involving stock delivered to defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") on January 21, 1977 ("the Amdahl transaction") and on February 24, 1977 ("the Kirby transaction"). Defendant Merrill Lynch has asserted a counterclaim against plaintiffs and additional defendants Carl Hornung and Joseph Ward ("Ward") d/b/a J&S Farms, to recover damages resulting from a third transaction ("the Polaroid transaction"). The action was tried before the Court without a jury. For the reasons hereinafter stated, plaintiffs' claims are dismissed and defendant Merrill Lynch is awarded judgment on its counterclaim.

I

*The Parties*

Plaintiff Colonial, a New Jersey corporation, with its principal place of business at

One Exchange Place, Jersey City, New Jersey, is registered with the Securities and Exchange Commission ("Commission") and the National Association of Securities Dealers ("N.A.S.D.") as a broker and dealer of securities. Plaintiff Catizone, a New Jersey resident, is present of Colonial. Intervenor-plaintiff Neuberger Securities Corp. ("Neuberger") is registered with the Commission and the N.A.S.D. as a broker and dealer of securities. Neuberger has purportedly assigned its claim against Merrill Lynch in the present action to Colonial.

Defendant Merrill Lynch, a Delaware corporation with its principal place of business at One Liberty Plaza, New York, New York, is also registered with the Commission and the N.A.S.D. as a broker and dealer of securities. Additional defendant Carl Hornung, a New York resident, managed accounts at Colonial and Merrill Lynch in the name of J&S Farms. Additional defendant Ward, a New York resident, contributed the capital for the J&S Farms accounts managed by Carl Hornung. Additional defendant Paul Hornung, a New York resident and brother of Carl Hornung, was at all relevant times a partner in New Hampshire Capital Co. ("New Hampshire") and the principal shareholder of Exeter Capital Fund, Inc. ("Exeter"), which had accounts at both Colonial and Merrill Lynch.

## II

### The Kirby Transaction

Prior to January 21, 1977, defendant Paul Hornung, acting through New Hampshire and Exeter, sold short a total of 10,200 shares of Kirby Exploration Co. ("Kirby") common stock in two special cash accounts at Merrill Lynch for settlement on or before January 21, 1977. Although the New Hampshire and Exeter accounts were nominally separate, Paul Hornung commingled funds between the two accounts and treated them as one. By February 23, 1977, more than a month after the settlement date, none of the 10,200 shares of Kirby had been delivered to Merrill Lynch. On that date, Merrill Lynch bought in 6,200 shares of Kirby for the account of Exeter. As a result of this purchase, and the buy-in of other stock, a debit balance was created in the Exeter account.

On February 24, 1977 Colonial delivered to Merrill Lynch certificates for 1,500 shares of Kirby which it had obtained from Neuberger earlier that day. The delivery bills accompanying the certificates stated that 1,100 of the shares were being delivered "for the account of: Exeter Capital Fund against the amount of: $38,198.96" and that 400 of the shares were being delivered "for the account of: New Hampshire Cap. Fund against the amount of: $13,-740.53 vs. trade of 1/21/77." In delivering the Kirby stock to Merrill Lynch, Colonial acted at the request of Paul Hornung and as agent for the New Hampshire and Exeter accounts. Neither Colonial nor Catizone had any beneficial interest in either of the accounts.

The 1,500 shares of Kirby which were delivered to Merrill Lynch had been purchased by Paul Hornung in a special cash account maintained in the name of New Hampshire at Colonial. Prior to making payment for the Kirby shares, Paul Hornung instructed Colonial to deliver the stock to Merrill Lynch against payment of the price at which the stock had previously been sold at Merrill Lynch. Colonial was therefore aware that Paul Hornung was planning to sell the stock before payment and that it would be paid for the Kirby stock only from the proceeds of the sale of that stock at Merrill Lynch.

Merrill Lynch, however, upon accepting delivery of the Kirby certificates did not pay cash to Colonial for New Hampshire's account. Instead, it credited the New Hampshire account with the full price at which the 1,500 shares of Kirby stock had been sold.

During the course of these dealings in Kirby stock, Merrill Lynch made no representations to Colonial or Catizone that it would make a cash payment to Colonial for Colonial's own account, nor did it ever suggest to Colonial that it would pay out any

more than the credit balance which existed in the New Hampshire and Exeter accounts. Nor did Catizone ever inform Merrill Lynch that New Hampshire and Exeter had accounts at Colonial, that Colonial had any transactions with Paul Hornung in Kirby stock, or that Colonial was ever acting as other than delivery agent for its principals.

After crediting New Hampshire for the 1,500 shares of Kirby received in the New Hampshire account, Merrill Lynch bought in, at a loss, on February 24, 1977, the remaining 2,500 shares of Kirby which were overdue in that account.

As a result of these transactions, there existed on February 24, 1977, a net debit balance in the Exeter account of $4,168.76, a net credit balance in the New Hampshire account of $17,643.55, or an overall net credit balance between the two accounts of $13,474.79. If Merrill Lynch had paid out $51,939.49 in cash for the 1,500 shares of Kirby it received on February 24, 1977, instead of crediting the New Hampshire account in that amount, there would have been an unsecured debit of $38,464.70 in the New Hampshire and Exeter accounts.

### III

### *The Amdahl Transaction*

Defendant Ward doing business as J&S Farms maintained special cash accounts at the Syracuse and One Liberty Plaza, New York City offices of Merrill Lynch, as well as at other brokerage firms. The capital for the J&S Farms brokerage accounts was contributed by Ward. Carl Hornung was authorized by Ward to manage the accounts and to enter orders for the purchase and sale of securities. However, Merrill Lynch sent account statements directly to Ward.

In December 1976, Ward d/b/a J&S Farms sold short 2,700 shares, 5,400 after a split, of Rovac stock in the Syracuse account. Upon his failure to deliver that stock, Merrill Lynch bought in 5,400 shares for the account of J&S Farms for settlement on January 24 and 26, 1977 at a total cost of $91,960. This buy-in resulted in a debit balance of $36,221.73. On January 21,

1977, Colonial, acting as agent for Ward d/b/a J&S Farms, delivered 1,000 shares of Amdahl stock to Merrill Lynch's New York office against payment of $34,057.50. The delivery was in partial satisfaction of the sale of 3,000 shares of Amdahl which Carl Hornung and Ward d/b/a J&S Farms had previously made at Merrill Lynch in that account.

The 1,000 shares of Amdahl delivered to Merrill Lynch had been purchased by Carl Hornung in a special cash account at Colonial in the name of J&S Farms. The purchase price was $36,586.50. However, neither Carl Hornung nor Joseph Ward d/b/a J&S Farms ever paid Colonial for the stock. Instead, they instructed Colonial to deliver the stock to Merrill Lynch against payment of $34,057.50. The fact that Colonial had not been paid for the Amdahl stock was not disclosed to Merrill Lynch at the time.

The settlement of the Rovac buy-ins had not occurred by January 21, 1977. On that date, Merrill Lynch's New York office believed that the Syracuse account of J&S Farms had sufficient funds to cover the delivery against payment of the 1,000 shares of Amdahl. Accordingly, on January 21, 1977, Merrill Lynch issued a check for $34,057.50 to "Colonial Securities, Inc. a/c J&S Farms." After the settlement of the Rovac buy-ins on January 24th and 26th, Merrill Lynch realized that the J&S Farms account had a credit balance of only $7,025.77, and not in excess of $34,057.50. Upon learning of its mistake, Merrill Lynch stopped payment on its check, advised Carl Hornung and Ward by letter dated January 27, 1977 of the facts and circumstances and offered to issue a check for the sales proceeds of the Amdahl shares upon receipt of a certified check for the cost of the buy-ins.

At the time the Amdahl stock was delivered to Merrill Lynch on January 21, 1977 Colonial was acting as a delivery agent and had no beneficial interest in the J&S Farms account.

### IV

### *The Polaroid Transaction*

At some time prior to February 4, 1977, Catizone and Carl Hornung agreed that, as

a means of repaying the debit balance in the J&S Farms account at Colonial, they would purchase a number of shares in the J&S Farms account at Merrill Lynch, obtain delivery of the stock and stop payment on the check given to Merrill Lynch for the purchase of the stock. They selected 1,000 shares of Polaroid because it would yield $33,175.00—approximately the amount that Catizone felt he had lost on the Amdahl transaction.

On Friday, February 4, 1977, Carl Hornung ordered the purchase of 1,000 shares of Polaroid Corporation in a special cash account of J&S Farms at Merrill Lynch. That afternoon, Catizone, acting for Colonial as agent for J&S Farms, personally delivered to Merrill Lynch Colonial's check payable to Merrill Lynch in the amount of $33,175.00, and dated February 7, 1977. He received in exchange a certificate for 1,000 shares of Polaroid Corporation common stock. Catizone knew at the time that Carl Hornung and Ward d/b/a J&S Farms would not and could not pay for the Polaroid stock. At the time Catizone presented Colonial's check to Merrill Lynch, he intended to stop payment on it before it was cashed. On February 7, 1977, Colonial stopped payment on its check to Merrill Lynch. Up until the present time the check has not been paid.

The Polaroid stock was delivered by Catizone into the J&S Farms account at Colonial on February 7th and sold for $32,538.50 on the following day. As a result, Carl Hornung and Ward d/b/a J&S Farms were able to reduce the J&S Farms debt to Colonial by that amount. Neither Catizone, Colonial, Ward d/b/a J&S Farms nor Carl Hornung has ever returned to Merrill Lynch the Polaroid stock which was procured in this transaction or paid Merrill Lynch for it.

## V

### The Claims of the Parties

Plaintiffs have cast their claims in a number of different counts in their amended complaint. Counts One and Two, seeking injunctive relief and Counts Four and Nine, seeking damages for violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b),[1] and Rule 10b–5, 17 C.F.R. § 240.10b–5,[2] were dismissed on consent at trial. The remaining counts seek damages for breach of contract in the Kirby transaction (Count Three), damages for conversion in the Kirby transaction (Count Five), damages and punitive damages for "willful and malicious acts" in the Kirby transaction (Counts Six and Eight), damages for interference with plaintiffs' contractual rights (Count Seven), damages for common law fraud in Amdahl transaction (Count Ten), damages for breach of contract in the Amdahl transaction (Count Eleven), and damages for stopping the check in the Amdahl transaction (Count Twelve).

---

1. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   *　*　*　*　*　*

   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

   (1) to employ any device, scheme, or artifice to defraud,

   (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

As of June 9, 1977, Paul Hornung had judgments against him in favor of Paine Webber Jackson & Curtis in the amount of $6,000.00 plus interest, Doft & Company in the amount of $11,000.00 and John Meyers in the amount of $12,000.00. Another action pending against him by Kidder, Peabody for $113,000.00 was then in the process of being settled. In August 1977, Paul Hornung executed a purported assignment of the New Hampshire account at Merrill Lynch to Catizone and Colonial. Prior to the assignment, levies in excess of the credit balance in this account were served upon Merrill Lynch by the Sheriffs of New York County, New York and Essex County, New Jersey. Plaintiffs allege that as assignees of Paul Hornung they are entitled to any credit balance in the New Hampshire account at Merrill Lynch and that as assignees of Neuberger's claim against Merrill Lynch they are entitled to either possession of the Kirby stock or its equivalent value.

Defendant Merrill Lynch counterclaims that plaintiffs and additional defendants, Carl Hornung and Ward d/b/a J&S Farms, in the course of the Polaroid transaction violated Section 10(b) and Rule 10b–5 and committed common law fraud.

### Discussion

This Court has jurisdiction over the parties and the subject matter of this action based upon diversity of citizenship and pursuant to § 27 of the Exchange Act, 15 U.S.C. §§ 78aa et seq.

Plaintiffs' main contention is that Merrill Lynch's failure to pay Colonial the full cash amount for the Kirby and Amdahl stock upon delivery constituted breach of contract. Specifically, plaintiffs assert, that Merrill Lynch and Colonial "entered into binding contracts wherein *Merrill [Lynch]* agreed to pay *Colonial* for stock upon *Colonial's* delivery to *Merrill [Lynch]*." Plaintiffs further argue that Colonial's agency relationship with the New Hampshire, Exeter, and J&S Farms accounts did not preclude it from entering into binding delivery versus payment contracts directly with Merrill Lynch.

The facts adduced at trial failed to establish any principal-to-principal dealings between Merrill Lynch and Colonial in either the Kirby or Amdahl transactions. Indeed, plaintiff Catizone himself flatly testified, with respect to the Kirby transaction, that Colonial acted solely as delivery agent "for the account of New Hampshire and Exeter," that Colonial had "no purchase or sale transactions with Merrill Lynch," and that Colonial had no "beneficial interest" in the New Hampshire or Exeter accounts. Catizone also testified that Merrill Lynch made no representation that it would make any cash payments to Colonial for Colonial's own account or that it would pay out in cash more than the credit balance in the respective accounts. In sum, all the evidence supports this Court's finding that Colonial acted solely as a delivery agent for disclosed principals in both the Kirby and Amdahl transactions.

It is a well settled rule in the law of agency that a person making or purporting to make a contract with another as an agent for a disclosed principal does not become a party to the contract, absent an agreement or indication to that effect. *Restatement (Second) of Agency* § 320 (1958). Without such an agreement or indication, the principle of legal identity embodied in the common law maxim—*Qui facit per alium facit per se*, he who acts through another acts himself—operates to make the acts of an agent within the scope of his authority, in legal effect, the acts of his principal. It is the principal who is entitled to any advantage flowing from the agent's authorized acts. It is also well settled that an agent cannot maintain an action on a contract in his own name on behalf of his principal unless he is a party to the contract, a transferee, or a holder of an interest in the contract. *Restatement (Second) of Agency* §§ 363, 372 (1958).

Applying these principles to the present case, the Court concludes that plaintiffs have failed to prove their claim against Merrill Lynch with respect to the Kirby transaction. The record amply dem-

onstrates that the New Hampshire and Exeter accounts were long overdue in providing Merrill Lynch with the 10,200 shares of Kirby stock which had previously been sold in those accounts and that Paul Hornung owed Merrill Lynch the stock delivered by his agent, Colonial. Merrill Lynch was therefore fully justified in crediting the New Hampshire account with the proceeds of that overdue delivery and in applying the credit against the existing debits.

Nor does the fact that Colonial's dealings with Merrill Lynch were in the form of "delivery versus payment" transactions support plaintiffs' contention. As defendant quite properly points out, the form of delivery begs the question of whether there were any direct contracts or principal-to-principal dealings between Colonial and Merrill Lynch. The "delivery" of stock was made by Colonial for the account of its principals, not for the account of Colonial; likewise, the "payment" against delivery was for the account of Colonial's principals, not for its own account.

■ Similarly, the record supports this Court's conclusion that plaintiffs have failed to prove any claim for relief against Merrill Lynch arising from the Amdahl transaction. The uncontroverted evidence presented at trial establishes that Colonial acted solely as an agent for Carl Hornung and Ward d/b/a J&S Farms in delivering 1,000 shares of Amdahl stock to Merrill Lynch on January 21, 1977. The evidence also conclusively establishes that Carl Hornung and Ward owed Merrill Lynch 3,000 shares of Amdahl stock on January 21, 1977 because of previous sales transactions in the J&S Farms accounts at Merrill Lynch's Syracuse office. Inasmuch as Merrill Lynch did not owe Ward d/b/a J&S Farms or Carl Hornung $34,057.50 on January 21, 1977, the issuance of a check to Colonial for the account of J&S Farms on that date, in that amount, was a mistake and Merrill Lynch was justified in stopping payment on the

check. When Merrill Lynch received the 1,000 shares of Amdahl for the account of J&S Farms, it was under no obligation to pay Colonial for its own account an amount it did not owe to Colonial's principals, Ward or Carl Hornung.

■ Plaintiffs' additional contentions that Merrill Lynch was guilty of wrongful conversion, common law fraud, and other "willful and malicious acts" in the Kirby and Amdahl transactions appear to be little more than restatements of their breach of contract claims and, in any event, are equally without merit. It is clear, as noted above, that Colonial delivered the Kirby and Amdahl stock to Merrill Lynch because the principals on whose behalf Colonial acted owed those shares to Merrill Lynch. Moreover, it is clear that Colonial's principals received full credit for the price at which the stock had been sold in their Merrill Lynch accounts. There was thus nothing wrongful, fraudulent or malicious in Merrill Lynch's refusal in both the Kirby and Amdahl transactions to pay Colonial. If Colonial has not been paid for the Kirby and Amdahl stock which it purchased and delivered to Merrill Lynch on behalf of New Hampshire, Exeter and J&S Farms, Colonial's remedy lies in an action against its principals for breach of their duty to reimburse their agent—not against Merrill Lynch.

Accordingly, Count Three, Counts Five through Eight, and Counts Ten through Twelve of the amended complaint are dismissed.

### The Neuberger and Hornung Assignments

■ Shortly after the commencement of trial, intervenor-plaintiff Neuberger entered into a stipulation with Colonial assigning its claim against Merrill Lynch to Colonial.[3] Shortly before trial, Colonial obtained the purported assignment of Paul Hornung's credit balance in the New Hampshire account at Merrill Lynch. Nei-

---

**3.** Neuberger's claim arose from Colonial's stopping payment on the check which the latter tendered to Neuberger for the Kirby stock on February 24, 1977. Neuberger alleged that

Merrill Lynch did not receive good title to the Kirby stock from Colonial, because Colonial merely had voidable title.

ther of these assignments improves Colonial's position in the present action.

Under New York's Uniform Commercial Code ("the Code"), Section 8–301(2), a "bona fide purchaser" acquires both the rights in a security which his transferor had and the security free of any adverse claim. An adverse claim is defined to include "a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security." U.C.C. § 8–301(1). A bona fide purchaser is defined as "a purchaser for value in good faith and without notice of any adverse claim . . . ." U.C.C. § 8–302.

Although Colonial now asserts that Merrill Lynch was not a bona fide purchaser of the Kirby shares because it had notice of an adverse claim—Colonial's own claim—Colonial failed to offer any evidence whatsoever at trial to support its assertion. Indeed, all the evidence presented at trial supports the conclusion that Merrill Lynch received the Kirby stock as a bona fide purchaser without notice.

With respect to the first of the three required elements for establishing bona fide purchaser status, it is clear that Merrill Lynch acquired the Kirby shares for "value." Having received the stock for the account of its customer, who had previously sold the stock, and having promptly credited the sales price to its customer's account, the Court finds that Merrill Lynch acquired it in "partial satisfaction of a pre-existing claim," U.C.C. § 1–201(44)(b), and thus for value within the meaning of the Code.

Likewise, there is nothing in the record to support the argument that Merrill Lynch did not act "honestly in fact" in the Kirby transaction and therefore failed to meet the Code's good faith requirement. U.C.C. § 1–201(19). On the contrary, plaintiff Catizone admitted that he never informed Merrill Lynch that the Kirby stock had been purchased at Colonial and that he never discussed Paul Hornung's transactions at Colonial with Merrill Lynch. There was thus no reason for Merrill Lynch to suspect that Colonial had any interest in the securities being delivered for the New Hampshire and Exeter accounts.

Finally, there is simply no evidence that Merrill Lynch had notice of any adverse claim to the Kirby shares. The record fully supports defendant's assertion that it received the 1,500 shares of the Kirby stock in the good faith belief that the stock had been paid for by the customer on whose behalf it was delivered.

Accordingly, the Court concludes that Merrill Lynch's status as a bona fide purchaser of the Kirby stock requires the dismissal of Neuberger's assigned claim.

The Court further concludes that whether plaintiffs are entitled to recover on the purported assignment of Paul Hornung's credit balance at Merrill Lynch cannot properly be determined in the context of the present action inasmuch as the parties failed to address this as an issue at trial. The Court is of the view that, in the absence of any apparent prejudice to the parties, the validity of the Hornung assignment should be determined in a separate interpleader action where all the claimants whose interests would be affected by such a ruling might be afforded an opportunity to be heard.

Therefore, the claim based upon the Paul Hornung assignment is dismissed without prejudice.

*The Polaroid Transaction*

On its counterclaim, Merrill Lynch asserts that plaintiffs and Carl Hornung violated § 10(b) of the Exchange Act, and Rule 10b–5 promulgated by the Securities and Exchange Commission, and committed common law fraud in the Polaroid transaction in order to compensate Catizone for a debt which Carl Hornung had incurred on behalf of Ward d/b/a J&S Farms in connection with the earlier purchase of Amdahl stock at Colonial.

It has long been established New York law that it is an act of fraud to purchase or secure goods with a preconceived intention not to pay for them. *Nichols v. Michael*, 23 N.Y. 264, 266 (1861); *Hall v. Naylor*, 18

N.Y. 588, 589 (1859); *Security Trust Co. v. Voxakis*, 67 Misc.2d 143, 144, 323 N.Y.S.2d 810, 812 (Sup.Ct. Monroe Co. 1971). Where the evidence is "clear and convincing" the party alleging fraud has met his burden of proof. *Manchel v. Kasdan*, 286 A.D. 483, 484, 144 N.Y.S.2d 694, 695 (1st Dep't 1955), *aff'd mem.*, 1 N.Y.2d 734, 151 N.Y.S.2d 940, 134 N.E.2d 687 (1956).

In the instant case, the Court concludes that defendant has met this burden. Although plaintiff Catizone testified that he did not consider stopping Colonial's check until he analysed the J&S Farms account at Colonial on the day after tendering his check to Merrill Lynch and realized there was an insufficient credit balance to cover the purchase price of the Polaroid shares, the Court having assessed his demeanor rejects his statement. All the credible evidence indicates that, from the outset, Catizone and Carl Hornung intended to pass on Catizone's loss on the Amdahl transaction to Merrill Lynch. Carl Hornung himself admitted, in the course of his pre-trial deposition, that 1,000 shares of Polaroid stock were arbitrarily chosen because they closely approximated the value of the Amdahl stock on which Merrill Lynch had stopped payment and would allow Colonial to "return the favor" to Merrill Lynch. Moreover, the Court finds highly persuasive evidence of Catizone's preconceived intent to defraud the defendant in the fact that the check delivered to Merrill Lynch on February 4, 1977 in exchange for the Polaroid certificates was post-dated February 7, 1977 and was in fact stopped early that morning. When viewed in conjunction with the accelerated manner in which the entire Polaroid transaction was conducted—the expedited transfer of the Polaroid shares to a nominee of Colonial early on the morning of February 7, 1977 and the prompt sale of that stock the next day—the issuance of the post-dated check fully warrants the finding that Catizone and Carl Hornung had no intention of paying Merrill Lynch for the Polaroid stock when it was purchased on February 4, 1977 and therefore committed common law fraud.

Having reached this conclusion, the Court need not decide whether the "garden type variety of fraud" present here sufficiently affects the strong public interest in maintaining the integrity of the securities markets as to constitute a violation of § 10(b) of the Exchange Act and Rule 10b–5. See *A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 396–97 (2d Cir. 1967).

Inasmuch as Joseph Ward authorized Carl Hornung to act on his behalf, knowingly received and accepted delivery of the fraudulently obtained stock in his account at Colonial, knowingly benefitted from the fraud by selling that stock in his account in order to reduce his debt to Colonial, and failed to return the Polaroid stock to Merrill Lynch or pay for it, he too is liable to Merrill Lynch in the same amount. *Taylor v. Commercial Bank*, 174 N.Y. 181, 188, 66 N.E. 726, 728 (1903).

Accordingly, the Court concludes that Colonial, Catizone, Carl Hornung, and Joseph Ward d/b/a J&S Farms are jointly and severally liable to Merrill Lynch on its counterclaim in the amount of $33,175 plus interest for fraud in obtaining 1,000 shares of Polaroid on February 4, 1977.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed.R.Civ.P.

Settle judgment on notice.