**E. F. HUTTON & COMPANY, INC., Plaintiff,**

**v.**

**Julian E. PENHAM, Defendant.**

**No. 81 Civ. 2080 (KTD).**

United States District Court, S. D. New York.

Sept. 24, 1982.

Berson & Berson, New York City, for plaintiff; Leo E. Berson, Neil M. Berson, New York City, of counsel.

Julian E. Penham, defendant pro se.

## OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge:

This decision is in great part dependent on the failure of the parties to sustain their requisite burden of proof by *credible* evidence. That failure requires the dismissal of the plaintiff's claims and the defendant's counterclaims. The result may not satisfy either party but I am convinced that justice will be accomplished thereby and hopefully that the appallingly vicious vendetta waged by each will be finally put to rest. *Cf. Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) for a discussion of *res judicata* and collateral estoppel.

The plaintiff E. F. Hutton & Company, Inc. ("Hutton") is a large brokerage dealer with membership on all of the major exchanges and a wide-spread system of branch offices. Julian Penham, the defendant, is a former Hutton "registered representative" or "account executive." Hutton brought this action alleging violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), Rule 10b–5, 17 C.F.R. § 240.10b–5 (1981), Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1976), Section 352–c of the New York General Business Law, and common law fraud supposedly arising out of Penham's handling of certain customer option trading accounts and his own Hutton options account. In essence, Hutton alleges that Penham executed unauthorized trades on his customers' behalf and at the same time executed option trades in his own account that he was unable to cover. Penham, appearing *pro se,* denied the allegations.

A non-jury trial was held before me on June 14, 15, 16, 17, 18, and 23, 1982 to resolve Hutton's allegations and Penham's

counterclaims.[1] The following shall constitute my findings of fact and conclusions of law.

## I.

The tale which was unraveled at trial has as its central characters Julian Penham and Irwin Dublirer, the former Hutton manager of the A–19 Branch Office where Penham worked during his tenure at Hutton. Mr. Dublirer, Penham's direct superior, was responsible for Mr. Penham's activities at Hutton and was eventually responsible for the defendant being fired.

Penham's previous employment in the securities industry included Shields, Modell, Roland, Inc., Herzfeld and Stern and Oppenheimer & Co. before he was hired by Hutton in July, 1980. Trial Transcript at 406. Penham opened option trading accounts for himself (Defendant's Exhibit 2), and his customers soon after his arrival at Hutton. Hutton's procedure required that all option investors, including its own account executives, sign an option agreement form. If the form is not signed within fifteen days of receipt or mailing, Hutton's internal regulations required that all transactions in that account are to be blocked. Trial Transcript at 74, 559; June 23, 1982 Stipulation at 4 ¶ 13, at 9 ¶ 6. Obviously this requirement is in recognition of the extreme volatility of the options market.

Mr. Penham amassed an impressive record at Hutton; as of September 30, 1980, Penham led all account executives at his branch in revenue production. Defendant's Exhibit 8. Penham's glory days at Hutton, however, were not long lived. On December 1st and 3rd, 1980, Penham ordered the purchase of a total of 550 Kerr-McGee Corporation options: 210 January 90 Calls[2] at market prices of 10 at 7⅛, 100 at 5⅜, 57 at 5¼ and 43 at 5⅛; 340 January 100 Calls at market prices of 140 at 3¾, 150 at 3⅝ and 50 at 3¼. Plaintiff's Exhibits 1, 2 and 3. These orders were placed in Penham's own trading account and he was subsequently sent written confirmations of these transactions. Plaintiff's Exhibits 1, 2, and 3. These trades were effected despite the fact that Penham never signed the option agreement form as required by Hutton. Defendant's Exhibit 2. Even though he denied it at trial, this fact was known to Dublirer. Hutton's automatic blocking procedure failed to spot the incompleteness of Penham's option agreement, and allowed the defendant to accumulate significant liability. These purchases, inclusive of commissions, amounted to a total indebtedness of $240,782.55. At the time of these substantial trades, Penham's own account had a balance of $67,812.24 and the defendant was without other means to cover these trades. Trial Transcript at 397. This fact was also known to Dublirer and apparently to the higher management of Hutton. Defendant's Exhibit 67, Trial Transcript at 367, 530–34. Penham maintains that the greater number of these trades were made for the benefit of Dublirer. One member of Hutton management, Robert Schulman, the regional director of option sales for the Atlantic region, had received a complaint from Penham in November about trades being placed in his account for the benefit of Dublirer, prior to the trades giving rise to this action. Trial Transcript at 593.

On December 4, 1980, Penham was called into Irwin Dublirer's office to discuss the Kerr-McGee purchases in question. After conceding that he did not have the money readily available, Penham requested that Dublirer not liquidate the trades and not call in Jerry Miller, Hutton's Regional Vice-President. Trial Transcript at 33–34. Dublirer ignored the defendant's requests and called in Miller for resolution of the problem. Miller ordered immediate liquidation of Penham's positions and immediate notifi-

---

1. On May 21, 1982, in a memorandum and order Penham's motion on the eve of trial to amend his answer to include fifty-two counterclaims was denied.

2. In options language, a call is a right to buy and a put is a right to sell "a fixed amount of a given stock at a specified price with a limited period of time." The New York Stock Exchange, The Language of Investing 23 (1974).

cation of Penham's problems to the legal department despite defendant's protestations. Trial Transcript at 36. This is the same Jerry Miller who less than two months earlier had written in a memo to Penham that his "career at E. F. Hutton is off to a flying start as exemplified by the excellent month you have just completed. Keep up the hard work and this month will become only one of many in which I expect will be a long line of notable achievements." Defendant's Exhibit 15.

A later meeting was held on December 4th in Miller's office between Penham, Dublirer, two representatives of Hutton's legal department and Miller. Penham was fired during this meeting because Hutton "did not believe I [Penham] could pay for purchases which I had made in my own account . . . ." Trial Transcript at 456. The defendant's requests that the positions remain intact to allow the value of the Kerr-McGee options to increase were rebuffed. Penham was given until the following morning to raise the money needed to cover his liabilities. Not surprisingly, the brief reprieve was not sufficient time for Penham to raise the necessary funds and his positions were subsequently transferred to the Hutton option department for liquidation. Trial Transcript at 40.

After Penham left Hutton's employ, the defendant's customers were referred to Irwin Dublirer. Mr. Dublirer, testified at trial that Stephen Null, Burton Crow, Harriet Hitman, Abraham and Bertha Teitel, Arthur Bellone, Douglas Sloan, Stephen Silk and Merrick Gagliano all informed him that Penham executed unauthorized trades in their accounts.[3] At trial, however, only Burton Crow, Merrick Gagliano and Stephen Silk testified as to allegedly unauthorized trades in their accounts.

Penham assumed the account of art director Gagliano after this customer's former account executive left Hutton. Gagliano, a candid and credible witness, fully

understood the risks of option trading. He closely and anxiously followed his trades. In his efforts to profit off the volatile option market, Gagliano authorized Penham to buy on November 13, 1980, 20 Motorola January 70 Puts at a price of 3⅛. Trial Transcript at 243. Penham's liquidation of these positions on December 2, 1980 at a price of 10 at 1 and 10 at 1¹/₁₆ was, however, unauthorized. A distraught Gagliano received the confirmation of these unauthorized sales and immediately called Penham at home to confirm that these unauthorized sales had in fact been effected. Penham, having just been fired, advised Gagliano to tell Hutton that both the purchase and sale of the Motorola options were unauthorized at which point Hutton might void the entire transactions and wipe out Gagliano's loss. Soon thereafter Gagliano called Dublirer to relay his distress and told him that only the sale of the options was unauthorized. Dublirer, even though he fully realized that the purchase of the Motorola Puts was authorized, decided in the name of "customer relations" to void the entire transaction though this had not been requested. Trial Transcript at 244, 362–63, Plaintiff's Exhibit 53.

Mr. Burton Crow, a present graduate student at Teacher's College, Columbia University who at the time of the transactions in question was director of student aid at Teacher's College, opened his option trading account at Hutton with Penham in July, 1980. Crow was an inexperienced investor who relied on Penham for advice on profit-making trades yet understood the real possibility of losing his entire investment on any given trade. Penham had success with Mr. Crow's account from August through October, 1980. Plaintiff's Exhibit 19. On November 13, 1980, Penham purchased 25 Motorola January 70 Puts at 3¾ which debited Crow's account $9,648.26. Plaintiff's Exhibit 16. Penham sold this position on

---

3. Saul and Marion Levine were named throughout this litigation as defrauded customers. However, once this court received a letter from Professor Levine complaining bitterly of counsel Neil Berson's harassing antics, Hutton

dropped the Levine claim during trial. Mr. Berson's comment that the Levine loss was a "mere $1,500," Trial Transcript at 127, ignores the damage to Mr. Penham's reputation that results from a charge of unauthorized trading.

December 2, 1980 for $2,302.28 resulting in a loss of $7,345.98. Plaintiff's Exhibit 18. During this same period of time, Penham also purchased for Crow's account 20 Kerr-McGee January 100 Calls, 8 at 3⅛ and 12 at 3, for a total price of $3,727.32. Crow testified that these Kerr-McGee and Motorola losing trades, which appear normal on their face, were unauthorized. This witness testified that because he was housesitting in Leonia, New Jersey during the times these trades were effected, his mail was not forwarded from his New York City home and he never received the Hutton confirmations. The implication was made that if Crow had received the confirmations he would have called Hutton sooner to complain. Trial Transcript at 262–63. Crow's testimony is contradicted by objective evidence. Mr. Crow's monthly Hutton statement reflects his New York City address for the months of August and September, 1980. Plaintiff's Exhibit 19. The monthly statement, however, was amended in October, 1980 to reflect Mr. Crow's residence in Leonia, New Jersey. The New Jersey address is on the monthly statements listing the trades in question and Crow acknowledged receiving the monthly statement. Trial Transcript at 274. The confirmations for the challenged trades also reflect the Leonia, New Jersey housesitting address, (Plaintiff's Exhibits 16, 17 and 18), and consequently cast serious doubt on the testimony of Mr. Crow. As was developed on cross examination, Mr. Crow first learned of Penham's termination when he called Hutton during the first week of December. Crow was not calling to complain about the trades recorded on his confirmations. Trial Transcript at 263. However, once Dublirer began to review Crow's account, I must conclude that Crow saw a perfect opportunity to renege previous authorization and recoup on heavy losses.[4] Relying on Crow's statement that the trades were unauthorized, Dublirer voided the trades in question. This option investor, who only too well appreciated the risks, should not be allowed to disavow authoriza-

tion when losses result. Hutton and Crow cannot shift the burden for Crow's loss onto Julian Penham.

Mr. Stephen Silk, the last customer to testify on plaintiff's behalf, met Mr. Penham for the first time at the end of July, 1980 after several telephone conversations. At that meeting in the Hutton offices, Silk tendered a certified check for $4,600 to cover the July 31, 1980 $4,594.35 purchase of Harnischfeger Corporation options for his and his wife's account. Defendant's Exhibit 42. Neither at this time nor at any time in the future did Mr. or Mrs. Silk sign the customer option agreement form authorizing Hutton to process trades in their account. Trial Transcript at 125, 217. The failure of the Silks to sign this form and the failure of Hutton to activate the automatic block on the Silk account forms, in part, the basis of the Hutton complaint.

Mr. Silk testified that after he received a confirmation of a purchase of 25 Motorola Puts January 70 at a price of 3¾ at a total amount of $9,648.26, (Plaintiff's Exhibit 10), he complained to Penham that this trade was unauthorized. Silk further testified that subsequently, after he received more confirmations, he again complained to Penham that five other transactions were also unauthorized: 50 Kerr-McGee Calls January 100 at 3⅜, 17 Motorola Puts January 70 at 1¹⁄₁₆, 8 Motorola Puts January 70 at 1⅛, 39 Kerr-McGee Calls January 90 at 4⅞, 61 Kerr-McGee Calls January 90 at 5. Plaintiff's Exhibits 10, 11, 12, 13, and 14. These transactions constitute some of the biggest trades and at the same time the biggest losses in the Silk account. Mr. Silk testified that he visited Hutton in early December to speak with the defendant, learned of Penham's termination and reviewed his account with Irwin Dublirer. Subsequently, Dublirer issued confirmation disregard notices on the above trades and credited Silk's accounts for all liability incurred on these trades: $77,502.99. Plaintiff's Exhibits 14, 51. This substantial adjustment to Silk's

---

4. Crow's losses of $15,960.49 are substantial in light of his estimated net worth of between

$25,000–39,999. Defendant's Exhibit 45.

benefit resulted solely from Silk's conversation with Dublirer where he picked and chose the authorized trades. Trial Transcript at 206. As in the case of Burton Crow, Stephen Silk's testimony was clearly tailored to suit his own financial interests. Mr. Silk testified that he did not notify Hutton sooner of the unauthorized trades because the confirmations were sent to his post office box and he did not check this mail repository every day. Trial Transcript at 228. This defense has an inherent inconsistency. If one maintains a post office box for important documents, then why was the box not checked more frequently? The explanation for this glaring inconsistency became clear: only after Silk learned that Penham was no longer in plaintiff's employ did he complain of unauthorized trades which coincidentally resulted in substantial losses. The bias of the witness and his financial stake in obtaining and retaining the $77,000 adjustment shone through Silk's testimony and destroyed his credibility.

One other noteworthy item concerning witness credibility must be mentioned. Irwin Dublirer was present during much of the trial yet not once did he look the defendant in the eye. This was particularly amazing to me since Penham, appearing *pro se,* conducted the cross-examination of Dublirer himself. Instead of looking at his examiner (and at times accuser), Dublirer looked at his hands, his counsel, the empty jury box, the windows on the other side of the courtroom but he never permitted his eyes to meet Penham's. I am convinced that Dublirer did not tell the truth when it came to the vital issues of this case.

**5.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations

## II.

It is on the basis of this scanty factual record that Hutton alleges that Penham violated the federal securities laws, New York's General Business Law and principles of common law. The allegations against Penham break down into two separate categories: one, unauthorized trading by Penham in customer accounts and two, unauthorized trading in Penham's own account. It is within these subdivisions that the serious charges levelled against Mr. Penham must be evaluated.

### A. *Customer Accounts*

Plaintiff unsuccessfully attempted to prove at trial that Penham executed unauthorized trades on behalf of customers Gagliano, Crow, Silk, Null, Hitman, Teitel, Sloan, Bressler and Bellone. Only Crow, Silk and Gagliano testified at trial and it was clear during the testimony of Crow and Silk that the Penham dilemma provided a convenient escape route from substantial liabilities. Merrick Gagliano's testimony, although credible, undermines the Hutton position. This witness testified that the trade executed on Gagliano's behalf by Penham was authorized; only the sale of this position was unauthorized. Hutton's amenability to wipe out the *entire* transaction to enhance customer relations and then sue Mr. Penham for Hutton's loss verges on the unethical. If, as Mr. Dublirer testified, this adjustment was Hutton's equitable solution to the Gagliano problem then Hutton and not Mr. Penham should bear the financial consequence of dispensing this equity.

█ In order to impose liability under Section 10(b),[5] Section 17(a),[6] or New York's

as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b) (1976).

**6.** Section 17(a) provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

General Business Law Section 352–c,[7] plaintiff must prove that damage resulted from Penham's unauthorized trading.[8] *Savino v. E. F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981); *Eriksson v. Galvin,* 484 F.Supp. 1108, 1127–28 (S.D.N.Y.1980); *Weitzman v. Stein,* 436 F.Supp. 895, 902 (S.D.N.Y.1977); *Corporate Finders and Consultants, Inc. v. Universal Container Corp.,* 39 A.D.2d 533, 330 N.Y.S.2d 862 (1st Dep't 1972). Hutton's failure to prove that it suffered any damages as a result of Penham's trading for customers requires the dismissal of these alleged violations. The credible evidence supports a finding that the only customer who could be said to have been harmed by Mr. Penham's activities was Mr. Gagliano. Hutton's decision, however, to void the entire Gagliano transaction when it was only partially unauthorized renders any reasonable calculation of damages impossible. Questions arise as to the market price of Gagliano's position post sale and Hutton's ability to cover this loss. None of these questions were answered at trial. Therefore, without a reasonable basis upon which damages can be assessed, plaintiff's claims must fall. *See Lexington Products Ltd. v. B. D. Communications, Inc.,* 677 F.2d 251 (2d Cir. 1982).

Hutton strenuously argued throughout the trial that it should be permitted to prove through Mr. Dublirer that Penham engaged in unauthorized trading in customer's accounts even without the testimony of these customers. In support of this theory Hutton offered Plaintiff's Exhibit 42, a summary of the losses it allegedly sustained in customer accounts as a result of Penham's activities. This exhibit was prepared by Hutton's Legal Department on the basis of Hutton's order tickets, customer account statements, customer confirmations and error account statements. Trial Transcript at 285. Hutton's position at trial was that the paperwork Hutton generated when crediting customer's accounts after the legal department had been notified by Dublirer of the unauthorized trades not only is admissible pursuant to the business records exception to the hearsay rule, Fed.R.Evid. 803(6), but also is conclusive proof of the unauthorized nature of the trades in question. These error reports are self-serving documents prepared by Hutton's chief witness in support of his version of the facts. To allow these documents as proof that the trades were in fact unauthorized and in

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (1976).

7. Section 352–c provides in relevant part:

1. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:

(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

(b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c) Any representation or statement which is false, where the person who made such

representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made;

where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

2. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to engage in any artifice, agreement, device or scheme to obtain money, profit or property by any of the means prohibited by this section.

N.Y.Gen.Bus.Law § 352–c (McKinney 1968).

8. Plaintiff's failure to prove any damages renders it unnecessary to discuss the other requisite elements of the alleged violations.

turn relieve Hutton of its burden to produce the customers themselves would render an unacceptable injustice on this *pro se* defendant and also strike at the core of the hearsay rule. In light of the fact that Crow, Silk and Dublirer's testimony has been found untrustworthy, these documents which form the basis for this aspect of Hutton's complaint must also be found to be untrustworthy and as such they cannot be accepted as proof of unauthorized trading. *See* Fed.R.Evid. 803(6).

■ Plaintiff, in its attempt to prove that customers were defrauded, argued that both Mr. Steven Null and Mr. Arthur Bellone were unavailable under Fed.R.Evid. 804. If Null and Bellone were found unavailable then Hutton hoped that Dublirer would then be permitted to testify, free of the restrictions of the hearsay rule, as to the unauthorized trades conducted by Penham in Null's and Bellone's accounts. While Rule 804(a)(5) does not insist that depositions be taken of all potential witnesses in the event that they later become unavailable, Fed.R.Evid. 804 advisory committee note, the Rule does include a good faith obligation to produce witnesses. *United States v. Sindona,* 636 F.2d 792, 804 (2d Cir. 1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981).

In a perfect world any lawsuit would be determined solely by the facts. But we live *in an imperfect world where the skill of advocacy (or lack thereof) can work to the detriment of any party in a litigation.* In this case, I have watched the tactics of plaintiff's counsel since the inception of this lawsuit and I am aware of the verbal and written abuse plaintiff's counsel has inflicted on all connected with this lawsuit, including the plaintiff's own witnesses. Plaintiff's argument that it was unfairly denied the right to serve deposition subpoena on allegedly defrauded customers after the discovery deadline ignores the repeated requests for adjournments of discovery which were granted by Magistrate Buchwald and the final discovery date that was set at April 2, 1982, with the agreement of the parties. Plaintiff's argument evidences the efforts of plaintiff's counsel to delay an impending trial and to reveal only that portion of the facts which supports its argument. Counsel's conduct throughout this litigation leaves me with the well founded impression that Null, Bellone, and all the other customers were not deposed or made available at trial as a result of counsel's conduct.[9] To deem Mr. Null and Mr. Bellone unavailable would allow Dublirer's hearsay testimony to stand and would further allow plaintiff to benefit as a result of its wrongdoing. *See* Fed.R. Evid. 804, advisory committee note. Accordingly, none of plaintiff's customers whose accounts form the basis of this suit are deemed unavailable.

■ When plaintiff's complaint which alleges that Penham executed unauthorized trades in customers' accounts is reduced to the proof at trial, plaintiff has failed to prove any damages to Hutton which resulted from Penham. Absent any proof of damages, Hutton has failed to prove a case against Penham under any of the statutes[10]

---

**9.** Two particularly glaring examples of plaintiff's counsel's conduct throughout this litigation are:

1. Counsel for plaintiff was ordered by Magistrate Buchwald on numerous occasions to turn over to the defendant a copy of his own deposition transcript. It was only after I issued two court orders that plaintiff finally complied with these orders on the eve of trial.

2. Plaintiff was ordered by Magistrate Buchwald and myself to turn over to the defendant all evidence, including order tickets, supporting its calculation of damages. This order was to allow Penham an opportunity to examine the order tickets for sales executed by Hut-

ton particularly in connection with its mitigation of damages. Plaintiff's counsel insisted in a pre-trial conference just before the trial began that after a thorough search, no such order tickets were located. Mr. John Bello, plaintiff's own witness, then testified that these order tickets did exist. Trial Transcript at 299. This was merely another blatant disregard of both the Magistrate's and my orders in an apparent attempt to prevent the defendant from preparing an adequate defense.

**10.** Plaintiff also relies on common law fraud as a basis for relief. Without any proof of damages this claim must also fall. *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir. 1980),

it invokes and its claim for relief for allegedly unauthorized trading in customer's accounts must be dismissed.[11]

### B. *Penham's Own Account*

It is uncontroverted that the defendant executed order tickets for 550 Kerr-McGee Calls in early December, 1980, without the funds to cover these purchases. Trial Transcript at 396–400. Penham's testimony that these orders were not intended for his own account is not fully supported by the evidence. Penham's suggestion that he and Dublirer entered into an agreement with respect to these Kerr-McGees to cover Dublirer's debts was not fully developed and cannot overcome the black and white order tickets in Penham's own hand which placed the Kerr-McGees in Penham's own account. Plaintiff's Exhibits 1, 2, 3, and 4.

It thus remains to be resolved whether this conduct, purchasing securities without the necessary funds, constitutes a violation of Section 10(b), Section 17(a), Section 325–c and common law fraud. Each alleged violation will be dealt with seriatim.

#### 1. Section 10(b)

■ *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) limited the class of Section 10(b) plaintiffs to the actual purchasers or sellers of securities who suffered a loss. This *Birnbaum* requirement, later upheld in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), "has been flexibly construed in order to accommodate the purpose of the anti-fraud provisions of the securities laws to protect the investing public and ensure honest dealings in securities transactions." *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080,

1093 (S.D.N.Y.1977), *aff'd,* 656 F.2d 1201 (2d Cir. 1980). The securities laws as a whole are intended to provide in addition to investor protection "a high standard of business ethics ... *in every facet of the securities industry."* *United States v. Naftalin,* 441 U.S. 768, 775, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979), *quoting SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–87, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963); *United States v. Newman,* 664 F.2d 12, 18 (2d Cir. 1981). Although Hutton did not purchase or sell as a customer the Kerr-McGees at issue here, it did execute the trades on Penham's behalf and it was an integral facet of the purchase of these options. Application of the securities laws to this case is consistent with the statutory language of Section 10(b) which proscribes fraud "in connection with the purchase or sale of a security."

■ The essential elements of any Section 10(b) claim include

(1) the use of a means or instrumentality of interstate commerce or of the mails in a scheme to defraud; (2) material misrepresentations or omission by the defendants of material facts; (3) an intent to deceive, manipulate or defraud plaintiff (scienter); (4) reliance by plaintiff upon defendants' misrepresentations; and (5) damages suffered by plaintiff as a result of his reliance or due to the fraudulent scheme.

*Weitzman v. Stein,* 436 F.Supp. 895, 902 (S.D.N.Y.1977) (citations omitted). Absent any evidence that the defendant's misrepresentations deceived the plaintiff, a Section 10(b) claim must fail. *See Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

---

cert. denied, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

11. This leaves for another day many unresolved issues. Although it appears settled in this Circuit that a private right of action exists under Section 17(a), *Savino v. E. F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1233 n.6 (S.D.N.Y. 1981), it is unclear whether Hutton can maintain a Section 17(a) suit on behalf of its alleged-

ly injured customers. *See United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). In light of the fact that Hutton credited all customers for losses incurred, it is likely that they acquired sufficient standing to sue for relief and accordingly I proceeded to address the merits of this aspect of the controversy.

■ Hutton argues that Penham's failure to disclose that he was unable to pay for the Kerr-McGee trades at the time the trades were executed constitutes a material misrepresentation or omission in Section 10(b) terms. However, when the admitted conduct of Mr. Penham is scrutinized it becomes apparent that although his conduct is not to be condoned, it was not violative of Section 10(b).

There is no litmus test for deciphering deceptive conduct; a case-by-case analysis is required. *Klamberg v. Roth,* 473 F.Supp. 544, 550 (S.D.N.Y.1979). In this case, the determinative issue is whether Penham misled Hutton into believing he was capable of paying for the challenged purchases. Whatever Penham may have done, he never deceived Hutton by claiming he had the funds to pay for the Kerr-McGee options. Defendant's financial data was at Hutton's fingertips: defendant's net worth as filed with plaintiff in September, 1982 was estimated between $25,000–39,999. Defendant's Exhibit 2; Trial Transcript at 505. I am convinced that Dublirer knew that Penham had no ready assets other than his option account. No evidence suggests that Hutton believed Penham was capable of covering the trade. Hutton's chief witness testified that on December 2, 1980, he had a conversation with the defendant regarding Kerr-McGee trades executed in November. Dublirer "simply asked him where he was going to get the money to purchase these options." Trial Transcript at 29. Furthermore, Penham did not assert at any time that he was capable of paying for the Kerr-McGee trades at the time of execution. Hutton was aware of Penham's financial status and his active option trading at the time the Kerr-McGee trades were made, (Trial Transcript at 31), yet no steps were taken to block his trading account or to prevent Penham from continued trading.

■ Section 10(b) does not impose upon Penham a duty "to disclose information to one who reasonably should already be aware of it." *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir. 1978), quoting *Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Eriksson v. Galvin,* 484 F.Supp. at 1126. Accordingly, Hutton cannot now seek recovery from Mr. Penham under the guise of the securities laws for damages it could reasonably have prevented. First of all, Mr. Penham's own account should have been blocked for his failure to sign the option agreement form. Stipulation, at 9 ¶ 6; Trial Transcript at 74, 611. Secondly, even if Dublirer did not know of Penham's financial condition, Hutton should have insisted on constant surveillance of all accounts to prevent exactly this type of result. Hutton erroneously claimed that supervision was an integral part of its working operations. Stipulation, at 8 ¶ 7; Trial Transcript at 381. Thirdly, at the moment when Hutton learned that Penham was trading beyond his means, his account should have been blocked immediately and an immediate attempt should have been made to mitigate losses. Hutton's failure to follow these basic guidelines and instead turn to litigation for relief cannot be placed on the shoulders of Penham. Hutton's claim that Penham misrepresented his financial status in an attempt to deceive Hutton is totally unsupported. Accordingly, the alleged violation of Section 10(b) is dismissed.

### 2. Section 17(a)

■ Both Section 17(a) and Section 10(b) are anti-fraud provisions. In order to state a claim under either section the plaintiff must prove that the defendant's misrepresentations were deceptive and resulted in its loss. *Savino v. E. F. Hutton & Co., Inc.,* 507 F.Supp. at 1235. As stated above, plaintiff has failed to prove any misrepresentation by the defendant. The Section 17(a) claim, therefore, must also be dismissed.

### 3. Section 352–c and common law fraud

■ These state claims find themselves in federal court under the doctrine of pendent jurisdiction. The dismissal of the federal bases for jurisdiction still affords me the discretion to resolve the remaining

state issues. *McLearn v. Cowen & Co.,* 660 F.2d 845, 848 (2d Cir. 1981). Because the federal issues were not dismissed until after a prolonged litigation and trial, considerations of judicial economy dictate that I resolve the remaining claims. Section 352–c and New York's common law fraud, like their securities counterparts which sound in fraud, both require proof of a misrepresentation of a material fact. *Mallis v. Bankers Trust Co.,* 615 F.2d at 80; *Eriksson v. Galvin,* 484 F.Supp. at 1128; *Schneck v. Bear, Stearns & Co.,* 484 F.Supp. 937, 946 (S.D.N.Y.1979).[12] Absent such proof, both of these claims are dismissed.

### III.

#### *The Counterclaims*

The defendant designates as counterclaims, *inter alia,* failure to mitigate and *respondeat superior.* These counterclaims are woefully inadequate and do not properly state claims against the plaintiff. Although a *pro se's* allegations are to be construed liberally, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), the defendant's failure to prove either claim at trial necessitates the dismissal of these counterclaims. Penham's further claims that Hutton was guilty of manipulation and fraud are unsupported by the record. Lastly, Penham claimed that Hutton was liable to him for defamation. Penham has been out of work (save for a one month job as a car salesman) since his termination from Hutton's employ. Trial Transcript at 517. He testified that he had attempted to obtain work throughout the securities industry. *See* Defendant's Exhibit 64. He further testified that he was employed at one brokerage firm for a period of less than two hours and that he had been offered another position by a different firm but that the offer had been withdrawn. Trial Transcript at 519. From this Penham would have this court conclude that Hutton

somehow defamed him and was responsible for his unemployment. Penham, however, offered no concrete proof supporting this alleged defamation. As with the other counterclaims, proof of this allegation is insufficient to support a judgment in Penham's favor.

### Conclusion

The complaint and the counterclaims are dismissed. No costs will be allowed to either side. Judgment will enter forthwith.

SO ORDERED.

---

**12.** Plaintiff's citation of *Colonial Securities, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 1159 (S.D.N.Y.1978) is unpersuasive. I do not question Judge Ward's determination in that case that under "New York law ... it is an act of fraud to purchase or secure goods without a preconceived intention to pay for them." 461 F.Supp. at 1167. In this case, however, there is no proof that Penham had the requisite fraudulent intent.